STATE OF NORTH CAROLINA v. CHARLES LOUIS PICKENS, JR.

No. 121A92-2

(Filed 24 July 1997)

**1. Constitutional Law § 355 (NCI4th)— first-degree murder—Fifth Amendment privilege—asserted by codefendant after plea bargain**

The trial court did not err in a noncapital first-degree murder retrial by accepting an assertion of the Fifth Amendment privilege against self-incrimination from a codefendant whom defendant wished to present as a witness and who had been convicted of first-degree murder in the first trial but who pled guilty to second-degree murder after the first-conviction was remanded

and who had been released from prison at the time of defendant's second trial. Although defendant contended that the trial court did not make sufficient findings regarding the codefendant's fear of future prosecution, the court conducted a *voir dire*, the possibility of perjury charges or federal charges was put forth by counsel as grounds upon which the privilege was asserted, and the court concluded that the possibility of perjury charges or federal prosecution constituted sufficient fear of future prosecution to justify the assertion of the privilege. Defendant lodged only a general objection, at no time asked for a more specific enunciation of the fear of future prosecution, and appeared in oral argument to concede the possibility of future federal prosecution.

**Am Jur 2d, Criminal Law §§ 703, 937.**

2. **Constitutional Law § 355 (NCI4th)— first-degree murder—codefendant—plea bargain—Fifth Amendment privilege not waived**

There was no waiver of the Fifth Amendment privilege against self-incrimination in a noncapital first-degree murder prosecution where a codefendant whom defendant wished to call as a witness and who had pled guilty to second-degree murder after the first convictions were remanded and been released by the time of this trial asserted his Fifth Amendment privilege based on fear of future prosecution for perjury or federal crimes. Waiver of the privilege against compulsory self-incrimination by a plea is applicable only to the criminal act for which the plea of guilty is entered, not to other criminal acts.

**Am Jur 2d, Criminal Law §§ 703, 937.**

3. **Constitutional Law § 352 (NCI4th)— murder—codefendant—Fifth Amendment—assertion before jury—not required**

The trial court did not abuse its discretion by not requiring a proposed witness to assert his Fifth Amendment privilege against self-incrimination in the presence of the jury in a noncapital first-degree murder retrial where the proposed witness was a codefendant who had pleaded guilty to second-degree murder and been released after the remand and before this trial. The probative value of asserting the privilege in front of the jury was substantially less than in *State v. Thompson*, 332 N.C. 204, because the defendant here sought to have the codefendant take respon-

sibility for firing the weapon that killed the victim but was tried under the theory of acting in concert, so that the factual possibility that defendant did not fire the weapon was immaterial. Moreover, the trial court allowed defendant to introduce a transcript of the codefendant's plea of guilty to murder, enabling defendant to present the substance of his desired evidence and to present it more effectively. The evidence was overwhelming that defendant and the witness had a common purpose to fire into an occupied dwelling, that shots were in fact fired into an occupied dwelling, and that the victim was killed as a direct result. Any error in not permitting defendant to place his witness on the stand was harmless.

**Am Jur 2d, Criminal Law §§ 701 et seq.; 936 et seq.**

**4. Constitutional Law § 355 (NCI4th)— granting of immunity to compel testimony—denied to defendant—not a due process violation**

An argument by a first-degree murder defendant that due process required that the State provide a codefendant with immunity from future prosecution so that he could testify for defendant because there are statutory mechanisms for the State to compel testimony was not preserved for appellate review where defendant neither asked the State or the trial court to grant defendant's witness immunity nor objected at the pretrial hearing or *voir dire* on these grounds. In any event, the evidence was available from other sources.

**Am Jur 2d, Criminal Law §§ 703, 937.**

**5. Evidence and Witnesses § 1026 (NCI4th)— first-degree murder—statement of codefendant exonerating defendant—not a statement against penal interest**

The trial court did not err in a noncapital first-degree murder retrial where a codefendant whom defendant wished to call as a witness was allowed to assert his Fifth Amendment privilege against self-incrimination and defendant was not allowed to introduce a statement in a letter by the codefendant which tended to exonerate defendant. Although defendant contends that the statement falls within the statement against penal interest hearsay exception of N.C.G.S. § 8C-1, Rule 804(b)(3), the statement is not against penal interest because the codefendant had already entered a guilty plea and was serving a sentence for the murder when the letter was written, there were no corroborating circum-

stances to indicate that the letter was trustworthy, and there were circumstances to indicate otherwise.

**Am Jur 2d, Criminal Law § 937.**

**6. Evidence and Witnesses § 86 (NCI4th)— first-degree murder—evidence of threats and assaults by codefendant against victim and family—excluded**

The trial court did not err in a noncapital first-degree murder retrial where a codefendant whom defendant wished to call as a witness was allowed to assert his Fifth Amendment privilege against self-incrimination and the trial court excluded evidence detailing repeated threats and physical assaults by the codefendant against his codefendant's girlfriend and her children, including the victim, earlier on the day of the murder. The evidence was duplicative and the codefendant's motive in killing the specific child was irrelevant since all of the evidence showed that neither codefendant could see who was in the apartment and that the shots were fired at random.

**Am Jur 2d, Evidence §§ 301, 404-412.**

**7. Evidence and Witnesses §§ 929, 928 (NCI4th)— first-degree murder—bystanders—testimony admissible through officers—excited utterance—present sense impressions**

The trial court did not err in a noncapital first-degree murder retrial by admitting the statements of several unidentified individuals through the testimony of two police officers where the testimony of one officer fit squarely within the excited utterance exception to the hearsay rule in that the scene was still chaotic when the officer arrived, an individual screamed that defendant had shot the victim, and the victim was still "sort of" falling when the officer entered the apartment, and the statements that several individuals made to the other officer identifying defendant as the person who shot the victim were made contemporaneously with the declarants' viewing of the events and were properly admitted as present sense impressions. Evidence which falls within a firmly rooted hearsay exception does not violate a defendant's right to confront and cross-examine witnesses.

**Am Jur 2d, Evidence § 865; Hearsay § 330.**

**Admissibility as part of res gestae, of accusatory utterances made by homicide victim after act. 4 ALR3d 149.**

**8. Indictment, Information, and Criminal Proceedings § 50 (NCI4th)— discharging a "shotgun, a firearm" into house—evidence that weapon a handgun—no fatal variance**

There was not a fatal variance between the indictment and the evidence where the indictment charged that defendant "did discharge a shotgun, a firearm," into a dwelling house while it was actually occupied and the evidence at trial established that the fatal shot came from a handgun. The essential element of discharging a firearm was alleged; the averment to the shotgun was not necessary, making it mere surplusage.

**Am Jur 2d, Indictments and Informations §§ 257, 259, 260.**

**9. Assault and Battery § 81 (NCI4th)— discharging a weapon into occupied property—sufficiency of evidence**

There was sufficient evidence of the felony of discharging a weapon into occupied property where the evidence established that defendant and Arrington were half brothers; that defendant became involved in a series of events while breaking up a fight between Arrington and Cannady by pointing a gun at Cannady; that two shots were fired at Cannady by the defendant or Arrington as Cannady fled; that defendant and Arrington were both seen carrying guns outside the apartment where the child was shot; that they threatened to kill Cannady and defendant was heard saying that he was going to kill everyone in the apartment for messing with his brother; shots were fired into the apartment immediately after defendant and Arrington were seen together outside making threats; and the intent of defendant and Arrington was to avenge the beating of Arrington by Cannady and to seek retribution for the perceived mistreatment of Arrington by several of the inhabitants of the apartment into which the shots were fired.

**Am Jur 2d, Assault and Battery §§ 90-96.**

**10. Criminal Law § 222 (NCI4th Rev.)— first-degree murder— statutory speedy trial—no error**

The was no error in the trial court's denial of a defendant's motion for a speedy trial under N.C.G.S. § 15A-711(c) on a first-degree murder retrial where defendant was released from the custody of the Department of Correction and returned to

STATE v. PICKENS

[346 N.C. 628 (1997)]

Buncombe County, where he was bonded out within six months of his request. Thus, even though defendant admitted that he failed to properly serve a copy of the motion on the district attorney and was not entitled to relief, the essential requirement of the statute was met.

**Am Jur 2d, Criminal Law §§ 652-663, 849-851.**

## 11. Constitutional Law § 321 (NCI4th)— first-degree murder retrial—constitutional speedy trial—no error

The constitutional right to a speedy trial was not violated in a first-degree murder retrial by the extended prosecution and appeal processes in the case where the length of delay was five years and six months from indictment to retrial, but only approximately eighteen months passed from the time of remand on the first appeal to the second trial and the primary reason for delay was defendant's appeal of his first conviction. The only prejudice defendant attributes to the delay was the unavailability of a witness for the prosecution who died before the second trial and whose prior testimony, including the cross-examination by defendant, was read into the record at the second trial at the prosecution's request. A balancing of the factors set out in *State v. McCollum*, 334 N.C. 208, indicates that defendant's constitutional right to a speedy trial was not violated.

**Am Jur 2d, Criminal Law §§ 652-663, 849-851.**

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from judgment imposing a sentence of life imprisonment entered by Patti, J., at the 27 November 1995 Criminal Session of Superior Court, Buncombe County, upon jury verdicts finding defendant guilty of one count of first-degree murder in perpetration of a felony and one count of discharging a weapon into occupied property. Heard in the Supreme Court 17 April 1997.

*Michael F. Easley, Attorney General, by Daniel F. McLawhorn, Special Deputy Attorney General, for the State.*

*Charles R. Brewer for defendant-appellant.*

LAKE, Justice.

This appeal marks the second time this case has come before this Court.

On 7 May 1990, defendant Charles Louis Pickens, Jr. was indicted for first-degree murder and discharging a firearm into occupied property. He and codefendant James Edward Arrington were tried jointly and capitally in September 1991. The jury found defendant guilty, and he was sentenced to life for the murder conviction. On appeal, this Court concluded that the joinder of the defendants for trial was prejudicial error and remanded the case for new, separate trials. *State v. Pickens*, 335 N.C. 717, 440 S.E.2d 552 (1994). Defendant was retried noncapitally to a jury at the 27 November 1995 Criminal Session of Superior Court, Buncombe County, Judge Timothy L. Patti presiding. The jury found defendant guilty of first-degree murder in perpetration of a felony and guilty of discharging a weapon into occupied property. Judge Patti merged the convictions for sentencing and sentenced defendant to a mandatory term of life imprisonment. Defendant appeals to this Court as of right from the first-degree murder conviction.

The State's evidence tended to show that the defendant, Charles Louis Pickens, Jr., is the half brother of James Edward Arrington. On 24 March 1990, Arrington and his longtime girlfriend, Karen Robinson, had an argument that continued for a substantial period of time. Arrington and Robinson lived together in Apartment 4-A of the Erskine Street Apartments in Asheville, North Carolina, with Robinson's three children, one of whom was the victim, nine-year-old Tereca Stewart.

The specific events surrounding the killing of Tereca Stewart on 24 March 1990 began in Apartment 18-B of the same housing complex. This was the apartment of Darryl Cannady and his mother, Gloria Cannady. When Darryl Cannady arrived home from work that day, Arrington and Robinson came to his apartment. They started to argue, and Ms. Cannady told them to leave. Outside, Arrington accused Robinson of "messing around" with Darryl Cannady and angrily slammed Robinson down on the pavement.

The Asheville police were called. Upon arrival, the police informed Robinson that one of her possible remedies was to swear out a warrant for the arrest of Arrington. Robinson and Ms. Cannady went to the magistrate's office and took out two separate warrants against Arrington. When they returned, Robinson began removing Arrington's belongings from Apartment 4-A with the help of several individuals. Just as they were finishing, Arrington arrived at the apartment carrying a gun, a knife and some nunchakus (a martial arts

weapon consisting of two sticks connected by a chain). Arrington ordered everyone but Robinson out of Apartment 4-A.

Arrington grabbed Robinson by the neck. Darryl Cannady then attacked Arrington, and the two began to fight. At approximately the same time, defendant's sister told defendant that Arrington and Cannady were fighting. Defendant proceeded toward Apartment 4-A, where the fight was taking place. At least two residents of the housing complex heard defendant make a statement to the effect that "he was going to kill everybody in that [expletive] apartment for messing with his brother."

Defendant burst into Apartment 4-A, pointed a rifle at Cannady and ordered Cannady to get off Arrington. Cannady fled the apartment as two shots were fired at him. As he was leaving, Cannady heard defendant ask Arrington, "Where's the nine?" He was referring to a nine-millimeter pistol. Cannady ran to Apartment 18-B, where Robinson and several others had also fled, including Robinson's children. Cannady and others saw Arrington and the defendant outside the apartment with guns. Someone yelled for everyone in the apartment to get down, but nine-year-old Tereca ran toward one of the adults in the living room. Just then, two shots were fired. One bullet pierced a living room window and struck young Tereca in the head. She was killed instantly. The bullet, a nine-millimeter round, passed through Tereca's brain and lodged in the apartment wall. A witness reported to the police that he saw defendant "with a gun shooting in the lady's window;" "[h]e was shooting in the living room window."

Calls were made to 911, and several Asheville police officers arrived within minutes. The housing complex was in a state of pandemonium. Sergeant William Wysong arrived while shots were still being fired. A man he believed to be Cannady grabbed him and pulled him to the ground. The man shouted hysterically, "He killed her. He shot—Fella [defendant] shot her. He just [expletive] shot her." While approaching Building 18, Lieutenant Tom Aardema heard several people scream "[t]hat was him," referring to the shooter as the black male driving away in an old Oldsmobile. Sergeant Walter Robertson testified that he saw the defendant driving away from the housing complex in an old model Oldsmobile.

Later that evening, defendant showed up at the Asheville Police Department and gave a statement to the police. Defendant had a conversation with his sister immediately after the interview in which he told her that "he didn't mean to shoot that little girl. He didn't know

she was in there." When his sister returned to her father's house, defendant called and told her to have her father go outside and get the "cigarettes" from under the lawn mower. A nine-millimeter pistol was found under the lawn mower. Two to three months later, a cousin of the defendant bought a nine-millimeter pistol from a man who was accompanied by defendant's father. Defendant's cousin ultimately turned the weapon over to an attorney. Ballistics tests established that this was the nine-millimeter pistol that fired the fatal shot.

As stated above, defendant and Arrington were both convicted of the first-degree murder of Tereca Stewart; both convictions were set aside by this Court; and the case was remanded for new, separate trials. At the time of defendant's second trial, Arrington had already been released from prison after serving a portion of his sentence under a plea arrangement with the State in which he pled guilty to second-degree murder. Defendant informed the trial court that he intended to call Arrington as a witness in his second trial. Arrington was placed on the witness stand in the absence of the jury, and his attorney informed the trial court that Arrington desired to assert his Fifth Amendment right. The trial court, during *voir dire*, confirmed this with Arrington and ruled that Arrington had the right to exercise his Fifth Amendment privilege based on the possibility of perjury charges or federal prosecution. Arrington's plea transcript was then offered into evidence through the testimony of a police officer. Defendant was again found guilty of first-degree murder and sentenced to life imprisonment.

[1] In his first assignment of error, defendant contends that the trial court erred by accepting Arrington's assertion of his Fifth Amendment privilege against self-incrimination, thereby not allowing defendant to present Arrington as a witness. Defendant argues that the trial court made insufficient findings regarding Arrington's fear of future prosecution, and that Arrington's privilege against self-incrimination was waived by virtue of his pleading guilty to and completing his sentence for the murder of Tereca Stewart. In the alternative, defendant claims that under due process Arrington should have been provided immunity from prosecution so that he could testify. Defendant also asserts that the trial court erred by refusing to allow him to introduce other evidence of Arrington's words and conduct tending to exculpate the defendant. Defendant maintains that he was prejudiced by the absence of this evidence because defendant's primary theory of defense was that Arrington was the person who fired the fatal shot. The inability to question

Arrington or to present other evidence of Arrington's words or conduct, defendant argues, prevented him from establishing an adequate defense as guaranteed by our state and federal Constitutions. We do not agree with these several arguments.

Defendant contends the trial court did not make sufficient findings regarding Arrington's fear of future prosecution as required before ruling upon the right of a witness to invoke his Fifth Amendment privilege. The Fifth Amendment right against compulsory self-incrimination was made applicable to the states through the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 12 L. Ed. 2d 653 (1964). It protects an individual from being compelled to give testimony which may incriminate him or which might subject him to fines, penalties, or forfeiture. *Allred v. Graves,* 261 N.C. 31, 35, 134 S.E.2d 186, 190 (1964). "When a witness invokes the Fifth Amendment privilege, the trial court is to 'determine whether the question is such that it may reasonably be inferred that the answer may be self-incriminating,' " *State v. King,* 343 N.C. 29, 47, 468 S.E.2d 232, 244 (1996) (quoting *State v. Eason,* 328 N.C. 409, 418, 402 S.E.2d 809, 813 (1991)), and the claim of privilege "should be liberally construed," *Allred,* 261 N.C. at 35, 134 S.E.2d at 189. The privilege applies not only to "evidence which an individual reasonably believes could be used against him in a criminal prosecution," *Maness v. Meyers,* 419 U.S. 449, 461, 42 L. Ed. 2d 574, 585 (1975), but also encompasses evidence that "would furnish a link in the chain of evidence needed to prosecute the claimant," *Hoffman v. United States,* 341 U.S. 479, 486, 95 L. Ed. 1118, 1124 (1951). However, the privilege only "protects against real dangers, not remote and speculative possibilities." *Zicarelli v. New Jersey State Comm'n of Investigation,* 406 U.S. 472, 478, 32 L. Ed. 2d 234, 240 (1972). It is for the trial court to determine, "from the implications of the question and in the setting in which it is asked," whether that real danger exists, and the trial court should deny the claim only if there is no such possibility. *State v. Ballard,* 333 N.C. 515, 520, 428 S.E.2d 178, 181, *cert. denied,* 510 U.S. 984, 126 L. Ed. 2d 438 (1993).

As required in this case, the trial court examined the possibility of future prosecution if witness Arrington were to be compelled to testify. When it became apparent that defendant intended to call Arrington as a witness, the trial court conducted a *voir dire* in the absence of the jury. At the *voir dire,* the trial court confirmed with the witness that he intended to assert his Fifth Amendment privilege. The trial court gave counsel for the parties and Arrington's counsel an

opportunity to argue their positions regarding Arrington's claim of privilege. The possibility of perjury charges or other federal charges was put forth by Arrington's counsel as grounds upon which the privilege was asserted. Based on *voir dire* and arguments of counsel, the trial court concluded that the "possibility of perjury charges or federal prosecution" constituted sufficient fear of future prosecution to justify Arrington's assertion of his Fifth Amendment privilege. Regardless of the correctness of this conclusion, defendant lodged only a general objection to this conclusion and ruling, and at no time did he ask the State or the trial court for a more specific enunciation of the witness' fear of future prosecution. In fact, defendant appears in argument to concede the possibility of future federal prosecution. Thus, we hold that, under the circumstances, the trial court's ruling allowing witness Arrington to refuse to testify on Fifth Amendment grounds was proper.

[2] Regarding defendant's argument that Arrington waived his right to invoke his Fifth Amendment privilege because of his guilty plea, we hold that defendant's argument is misplaced. Waiver of the privilege against compulsory self-incrimination by a plea is applicable only to the criminal act for which a plea of guilty is entered, not to other criminal acts. *United States v. Tindle*, 808 F.2d 319, 325 (4th Cir. 1986). Because there was an asserted fear of future prosecution for other crimes, Arrington's plea of guilty did not act as a complete waiver of his privilege against self-incrimination.

[3] A related question remains, however. Defendant contends that he should at least have been able to compel Arrington to take the witness stand and assert his Fifth Amendment privilege in front of the jury. The purpose of doing so would be to raise the inference that someone else pled guilty to or was responsible for this crime, thereby bolstering defendant's claim that he was not involved in the shooting. Defendant analogizes this case to *State v. Thompson*, 332 N.C. 204, 420 S.E.2d 395 (1992), in which this Court held that the trial court did not err by allowing the prosecutor to call a witness to the stand, knowing that the witness would invoke his Fifth Amendment privilege. There, the Court quoted from a federal Sixth Circuit Court of Appeals' decision in stating that, "We believe that this was permissible because the prosecutor's case would be 'seriously prejudiced' by failure to offer [the codefendant] as a witness in light of [the codefendant's] role in the murder." *Thompson*, 332 N.C. at 223, 420 S.E.2d at 406 (quoting *United States v. Vandetti*, 623 F.2d 1144, 1147 (6th Cir. 1980)). The defendant argues the same privilege as is afforded

prosecutors should be given to defendants. Because there appears to be no North Carolina case directly on point, and because this Court's ruling in *Thompson* was based on the Sixth Circuit's opinion in *Vandetti*, it is appropriate that we review the principles enunciated in *Vandetti* to assess their applicability to this case.

In *Vandetti*, the court noted that the Sixth Circuit had previously allowed the calling of a witness who indicated he would assert his Fifth Amendment privilege where " 'the prosecutor's case would be seriously prejudiced by a failure to offer him as a witness.' " *Vandetti*, 623 F.2d at 1147 (quoting *United States v. Kilpatrick*, 477 F.2d 357, 360 (6th Cir. 1973)) (The court recognized in footnote that most of the federal circuit courts hold it is not error for the judge to disallow such testimony of a witness). The court went on to caution "that it is a practice so imbued with the 'potential for unfair prejudice' that a trial judge should closely scrutinize any such request." *Id.* (quoting *United States v. Maffei*, 450 F.2d 928, 929 (6th Cir. 1971), *cert. denied*, 406 U.S. 938, 32 L. Ed. 2d 138 (1972)). This is because there are two difficulties that may arise when a witness is presented and then refuses to testify by asserting his Fifth Amendment privilege. The first is that it permits the party calling the witness to build or support his case out of improper speculation or inferences that the jury may draw from the witness' exercise of the privilege, which cannot be adequately corrected by trial court instruction. *Id.* at 1148 (citing, *e.g.*, *Namet v. United States*, 373 U.S. 179, 10 L. Ed. 2d 278 (1963)). The second concern is that it encroaches upon the constitutional right to confrontation because the presentation of the exercise of the privilege cannot be tested for relevance or value through cross-examination. *Id.* (citing, *e.g.*, *Douglas v. Alabama*, 380 U.S. 415, 13 L. Ed. 2d 934 (1965)). As a result of these difficulties, "the trial judge must weigh a number of factors in striking a balance between the competing interests." *Id.* at 1149 (citing *Eichel v. New York Central R.R. Co.*, 375 U.S. 253, 11 L. Ed. 2d 307 (1963)). Such a balancing will be left to the discretion of the trial court in determining whether the probative value of the proffered evidence is substantially outweighed by the danger of unfair prejudice in accordance with Rule 403 of the Rules of Evidence. *Id.*

In *Thompson*, putting the witness on the stand was significantly probative for its value in identifying the person hired by the defendant to kill the victim in a contract killing case. In the case *sub judice*, the probative value of Arrington asserting his Fifth Amendment privilege in front of the jury was substantially less than in *Thompson*. The

defendant here sought to have Arrington take responsibility for firing the weapon that killed the victim. However, under the theory of acting in concert, by which defendant was tried, the factual possibility that defendant did not fire the weapon which held the fatal bullet was immaterial since the two codefendants had the common purpose to commit a murder, and a murder was in fact committed. *State v. Barnes*, 345 N.C. 184, 481 S.E.2d 44 (1997). Moreover, in this case, the trial court allowed defendant to introduce into evidence a transcript of Arrington's plea of guilty to murder, thereby enabling defendant to present the substance of his desired evidence and to present it more effectively. Allowing Arrington to assert his privilege in front of the jury would have injected the risk of the jury making erroneous inferences about the relative roles and degrees of culpability of the defendant and Arrington, a risk which was unnecessary in light of the trial court's admission of Arrington's transcript of plea. Thus, requiring Arrington to take the stand merely to allow defendant to raise an inference of Arrington's guilt would have been needlessly duplicative and less effective for defendant's purpose. In *Thompson*, the risk of prejudice or confusion was minimal since the defendant's role in the murder was clearly not as the actual shooter. Considering these various factors, we hold that the trial court did not abuse its discretion by not requiring this proposed witness to assert his Fifth Amendment privilege in the presence of the jury.

Assuming *arguendo* that the trial court erred by not permitting defendant to place his proposed witness on the stand, such error was harmless beyond a reasonable doubt. The State prosecuted defendant upon a theory of acting in concert. As this Court recently clarified in *Barnes*:

> The correct statement of the doctrine of acting in concert in this jurisdiction is that . . . :
>
>> [I]f "two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose . . . or as a natural or probable consequence thereof."
>
> [*State v.*] *Erlewine*, 328 N.C. [626,] 637, 403 S.E.2d [280,] 286 [1991] (quoting [*State v.*] *Westbrook*, 279 N.C. [18,] 41-42, 181 S.E.2d [572,] 586 [1971]) (alterations in original).

*Barnes,* 345 N.C. at 233, 481 S.E.2d at 71. The evidence was over-whelming in establishing that defendant and Arrington had a common purpose to fire into an occupied dwelling, that shots were in fact fired into an occupied dwelling, and that the victim was killed as a direct result.

**[4]** In a related argument under his first assignment of error, defend-ant next contends that in the interest of due process, the State should have provided Arrington with a guarantee of immunity from future prosecution so that he could testify on defendant's behalf. Defendant notes that N.C.G.S. §§ 15A-1051 and -1052 provide the State with mechanisms for compelling the testimony of witnesses by granting them immunity from crimes that might otherwise form the bases for claims of privilege against self-incrimination. N.C.G.S. §§ 15A-1051, -1052 (1988). Defendant contends that due process requires a crimi-nal defendant be afforded the same power, especially where the tes-timony is likely to be exculpatory.

We note at the outset that defendant has failed to preserve this argument for review. A thorough examination of the record reveals that the defendant neither asked the State or the trial court to grant defendant's proposed witness immunity nor objected at the pretrial hearing or *voir dire* at trial on the grounds asserted here. Thus, this argument was not preserved for review and may not be raised for the first time on appeal. N.C. R. App. P. 10(b). In any event, the evidence defendant sought to introduce to the jury was available from other sources. At trial, defendant testified on his own behalf that he was not directly involved in the murder and that it was Arrington who fired the shots. The trial court allowed defendant to enter into evi-dence the transcript of Arrington's plea of guilty to the murder, and defendant was allowed to identify Arrington in open court as the other person arrested for the crime.

**[5]** Defendant further argues that, even if not permitted to call Arrington as a witness, defendant should have been allowed to intro-duce certain statements made by Arrington that tended to exonerate defendant. Defendant first contends that the trial court erred by sus-taining an objection to the attempted admission of a letter written by Arrington that included the statement, "Don't worry about the murder case because I did it and you didn't have nothing to do with it." Defendant claims this falls within the statement against interest hearsay exception contained in Rule 804(b)(3). Defendant is incor-rect. The applicable rule reads as follows:

(b) Hearsay exceptions.—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

    (3) Statement Against Interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability is not admissible in a criminal case unless corroborating circumstances clearly indicate the trustworthiness of the statement.

N.C.G.S. § 8C-1, Rule 804(b)(3) (1992). The letter at issue does not meet either of the two requirements for admission set forth by the exception. First, it is not a statement against penal interest because Arrington had already entered a guilty plea and was serving a sentence for the murder when the letter was written. Second, there are no corroborating circumstances to indicate that the letter was trustworthy, and there are circumstances to indicate otherwise. Arrington is the half brother of the defendant, numerous witnesses testified that defendant was running around the apartments when the shots were fired, and several witnesses testified that it was defendant who fired the shots. These circumstances indicate that the letter was untrustworthy. As a result, the trial court properly refused to admit this evidence.

Defendant further contends that the trial court erred by sustaining objections to several additional statements made by Arrington. Defendant fails, however, to offer any substantive argument as to these or to cite any authority in support of this portion of his assignment of error. As a result, these are deemed abandoned. A thorough review of the statements, however, indicates that each was clearly hearsay and did not fall within any exception to that rule. N.C.G.S. § 8C-1, Rule 802 (1992).

[6] Finally, defendant asserts that the trial court erred by excluding his tender of more evidence detailing repeated threats and physical assaults by Arrington on Karen Robinson and her children, including the deceased child, earlier on the day of the murder. Defendant maintains that this evidence was relevant to defendant's claim that it was

Arrington and not he that killed the victim. Relevant evidence is that which tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). We hold that the evidence was not relevant. First, this evidence was needlessly duplicative in that evidence of the assaults earlier in the day and of Arrington and Robinson's troubled relationship was introduced into evidence several other times during the trial. N.C.G.S. § 8C-1, Rule 403 (1992). Second, evidence of Arrington's motive in killing the specific child was irrelevant to determination of the case since all of the evidence showed that neither the defendant nor Arrington could see who was in the apartment and since the shots were fired at random. For these reasons, the trial court properly excluded the above evidence. N.C.G.S. § 8C-1, Rule 402 (1992). Defendant's assignment of error is overruled.

**[7]** In his second assignment of error, defendant contends that the trial court erred by improperly admitting the hearsay statements of several unidentified individuals through the testimony of two police officers. Defendant argues that the admission of these statements constitutes a violation of his right to be confronted by the witnesses against him under the Sixth Amendment to the United States Constitution. We disagree.

The statements at issue occurred immediately after the shooting. Two Asheville police officers, Sergeant Wysong and Lieutenant Aardema, arrived at the housing complex shortly after being notified that there was shooting taking place. The officers testified the complex was in a state of pandemonium, with people screaming and running in different directions. Sergeant Wysong testified at trial that an individual he did not know screamed at him, "He killed her. He shot—Fella shot her. He just [expletive] shot her." Other trial evidence established that "Fella" is the nickname of the defendant. Lieutenant Aardema testified that he saw defendant with something in his hand and that people started screaming, "That was him. That was him," referring to the defendant as the shooter. Lieutenant Aardema also testified that "people were screaming. They were all—there was a lot of people out here and they were screaming that 'That was him. That was him,' in the car," referring to a gray Oldsmobile which defendant drove that evening. Defendant objected to all of these statements, and he made motions to strike and motions for mistrial after each of the statements. The trial court overruled the objections and denied the motions in each instance.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1992). Any hearsay statement as defined in Rule of Evidence 801(c) is inadmissible except as provided by statute or the Rules of Evidence. N.C.G.S. § 8C-1, Rule 802. Rule 803 provides that certain statements are not excluded as hearsay regardless of the availability of the declarant for purposes of testifying. N.C.G.S. § 8C-1, Rule 803 (1992). The first two exceptions, present sense impression and excited utterance, are applicable to this case and provide as follows:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (1) Present Sense Impression.—A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.
>
> (2) Excited Utterance.—A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

N.C.G.S. § 8C-1, Rule 803(1), (2). The basis of the present sense impression exception is that closeness in time between the event and the declarant's statement reduces the likelihood of deliberate or conscious misrepresentation. *State v. Gainey,* 343 N.C. 79, 86, 468 S.E.2d 227, 232 (1996). For a statement to be admitted as an excited utterance, "there must be (1) a sufficiently startling experience suspending reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication." *State v. Smith,* 315 N.C. 76, 86, 337 S.E.2d 833, 841 (1985).

The statements at issue in this case are classic examples of statements falling within these two exceptions. Sergeant Wysong testified that when he arrived at the still-chaotic scene, an individual he believed to be Mr. Cannady forced him to the ground and screamed, "He killed her. He shot—Fella shot her. He just [expletive] shot her." Sergeant Wysong testified he arrived at the scene so shortly after the shooting that, after hearing the above statement, he went into the apartment, and the child "was actually still—sort of still falling." The hearsay declarant had just witnessed the shooting of a child and clearly was still experiencing the effects of the extremely startling

event. There was no time to reflect on his thoughts or fabricate a story between the actual shooting and the statement, thus making the declaration spontaneous. Hence, the statement fits squarely within the excited utterance exception to the hearsay rule and was properly admitted. Lieutenant Aardema testified that several individuals made statements identifying the defendant as the person who shot the victim, when defendant was seen running with a gun and when defendant was seen driving an old Oldsmobile. The evidence establishes that these statements were made contemporaneously with the declarants' viewing of the events. As such, they were made while the declarants were perceiving the event or condition, or immediately thereafter, and were properly admitted as present sense impressions.

Defendant's contention that the admission of these statements violated his constitutional right to confront witnesses is similarly without merit. Evidence which falls within a firmly rooted hearsay exception does not violate a defendant's right to confront and cross-examine witnesses. *Gainey*, 343 N.C. at 86, 468 S.E.2d at 231-32; *State v. Stager*, 329 N.C. 278, 317, 406 S.E.2d 876, 898 (1991); *State v. Roper*, 328 N.C. 337, 359-60, 402 S.E.2d 600, 613, *cert. denied*, 502 U.S. 902, 116 L. Ed. 2d 232 (1991). As the statements at issue clearly fall within established exceptions, this assignment of error is overruled.

[8] In his next assignment of error, defendant maintains that the trial court erred by failing to grant his motions to dismiss the charges made at the conclusion of the State's evidence and at the close of all the evidence. This asserted error is based on two grounds: first, that there was a fatal variance between the indictment, which alleged defendant fired into an occupied dwelling with a shotgun, and the evidence at trial, which established that the fatal shot came from a handgun; and second, that there was insufficient evidence to establish that defendant and Arrington acted together with a common purpose to commit the felony of discharging a weapon into occupied property. We find defendant's contentions to be without merit.

Regarding the alleged variance between the indictment and the evidence at trial, defendant based his motions at trial solely on the ground of insufficient evidence and thus has failed to preserve this argument for appellate review. *State v. Francis*, 341 N.C. 156, 160, 459 S.E.2d 269, 271 (1995). However, assuming *arguendo* that defendant has preserved this argument for review, we hold that the asserted variance does not constitute error in this case. As this Court noted in *State v. Waddell*, 279 N.C. 442, 183 S.E.2d 644 (1971):

> A motion to dismiss [for a variance] is in order when the prosecution fails to offer sufficient evidence the defendant committed the offense charged. A variance between the criminal offense charged and the offense established by the evidence is in essence a failure of the State to establish the offense charged.

*Id.* at 445, 183 S.E.2d at 646. In order to prevail on such a motion, the defendant must show a fatal variance between the offense charged and the proof as to "[t]he gist of the offense." *Id.* This means that the defendant must show a variance regarding an essential element of the offense. *State v. Williams*, 295 N.C. 655, 663, 249 S.E.2d 709, 715 (1978). The essential element of the offense at issue here is "to discharge . . . [a] firearm." N.C.G.S. § 14-34.1(2) (Supp. 1996). The indictment in this case alleged that defendant "did discharge a shotgun, *a firearm,* into the dwelling house of Gloria Cannady . . . while it was actually occupied." (Emphasis added.) When an averment in an indictment is not necessary in charging the offense, it will be " 'deemed to be surplusage.' " *State v. Stallings*, 267 N.C. 405, 407, 148 S.E.2d 252, 253 (1966) (quoting 30A C.J.S. *Escape* § 25(6), at 900 (1965)). In this case, the essential element of discharging a firearm was alleged. The averment to the shotgun was not necessary, making it mere surplusage in the indictment. Thus, the first part of this assignment of error is overruled.

**[9]** At the close of the State's evidence and again at the close of all the evidence, defendant made motions to dismiss the charges against him. These were based in part on the assertion that there was insufficient evidence that the defendant and Arrington acted in concert to commit the crimes charged. When a defendant moves for dismissal, the trial court must determine whether the State has presented substantial evidence of each element of the offense charged and substantial evidence that the defendant was the perpetrator of such offense. *State v. Stroud*, 345 N.C. 106, 111, 478 S.E.2d 476, 478 (1996). If substantial evidence of each element is presented, the motion to dismiss is properly denied. *Id.* "Substantial evidence is 'that amount of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *State v. Porter*, 303 N.C. 680, 685, 281 S.E.2d 377, 381 (1981)). In ruling on a motion to dismiss, the trial court must consider the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *Id.*

Under the doctrine of acting in concert, "one may be found guilty of committing the crime if [1] [defendant] is at the scene acting

together with another [2] with whom [defendant] shares a common plan to commit the crime, [3] although the other person does all the acts necessary to effect commission of the crime." *State v. Abraham*, 338 N.C. 315, 346, 451 S.E.2d 131, 147 (1994); *see also Barnes*, 345 N.C. at 233, 481 S.E.2d at 71. The evidence at trial established the following: (1) that defendant and Arrington were half brothers; (2) that defendant became involved in a series of events while breaking up a fight between Arrington and Darryl Cannady by pointing a gun at Cannady; (3) that two shots were fired at Cannady by the defendant or Arrington as Cannady fled; (4) that the defendant and Arrington were both seen carrying guns outside the apartment where the child was shot; (5) that they threatened to kill Cannady, and defendant was heard saying he was going to kill everyone in the apartment for messing with his brother; and (6) that shots were fired into the apartment immediately after defendant and Arrington were seen together outside making threats. The evidence also showed that the intent of defendant and Arrington was to avenge the beating of Arrington by Cannady and to seek retribution for the perceived mistreatment of Arrington by several of the inhabitants of the apartment into which the shots were fired. Thus, the evidence taken in the light most favorable to the State was clearly sufficient to establish that defendant was present at the scene with Arrington and that the two were carrying out a common plan. The trial court properly denied defendant's motions to dismiss, and this assignment of error is overruled.

**[10]** In his final assignment of error, defendant contends that the trial court erred by failing to dismiss the charges against him based on the denial of his right to a speedy trial under N.C.G.S. § 15A-711 and the Sixth Amendment to the United States Constitution. This assignment of error is without merit.

Much of defendant's argument centers on rulings made before and during his first trial. Because there are no assignments of error in this record on appeal to rulings which occurred during the first trial, such rulings are not properly before us. N.C. R. App. P. 10(a). After this Court ordered a new trial, defendant made a *pro se* motion for speedy trial pursuant to N.C.G.S. § 15A-711(c) on 15 June 1994, and defendant made a motion through counsel alleging constitutional speedy trial violations just five days before his second trial. These motions are subject to our review. N.C.G.S. § 15A-711 provides in part:

(a) When a criminal defendant is confined in a penal or other institution under the control of the State or any of its subdivi-

sions and his presence is required for trial, the prosecutor may make written request to the custodian of the institution for temporary release of the defendant to the custody of an appropriate law-enforcement officer who must produce him at the trial. The period of the temporary release may not exceed 60 days. The request of the prosecutor is sufficient authorization for the release, and must be honored, except as otherwise provided in this section.

. . . .

(c) A defendant who is confined in an institution in this State pursuant to a criminal proceeding and who has other criminal charges pending against him may, by written request filed with the clerk of the court where the other charges are pending, require the prosecutor prosecuting such charges to proceed pursuant to this section. A copy of the request must be served upon the prosecutor in the manner provided by the Rules of Civil Procedure, G.S. 1A-1, Rule 5(b). If the prosecutor does not proceed pursuant to subsection (a) within six months from the date the request is filed with the clerk, the charges must be dismissed.

N.C.G.S. § 15A-711(a), (c) (Supp. 1996). In the case of *State v. Hege*, 78 N.C. App. 435, 337 S.E.2d 130 (1985), Judge Webb (now Justice Webb) authored an opinion for a unanimous court holding that failure to serve a section 15A-711(c) motion on the prosecutor as required by the statute bars relief for a defendant. *Id.* at 437, 337 S.E.2d at 132. In the present case, defendant admitted during the hearing on this motion that he failed to properly serve a copy of his 15 June 1994 motion upon the district attorney. Thus, defendant is not entitled to relief. Moreover, notwithstanding this procedural bar, the undisputed evidence at the motion hearing establishes that the requirements of N.C.G.S. § 15A-711 were met by the prosecution. Defendant was released from the custody of the Department of Correction and returned to Buncombe County, where he was bonded out in October of 1994. This was within six months of defendant's request. This met the essential requirement of the statute, that the defendant be temporarily released from the correctional institution and returned to the custody of an appropriate local law enforcement officer within six months of filing the request. *State v. Dammons*, 293 N.C. 263, 267-68, 237 S.E.2d 834, 837-38 (1977). Thus, no violation of N.C.G.S. § 15A-711 occurred, and the trial court properly denied the defendant's motion.

STATE v. PICKENS

[346 N.C. 628 (1997)]

**[11]** Defendant also asserts that his constitutional right to a speedy trial was denied by virtue of the extended prosecution and appeal processes in this case. This Court has held that four interrelated factors must be considered and balanced in deciding whether a defendant's Sixth Amendment right to a speedy trial has been violated. *State v. McCollum*, 334 N.C. 208, 433 S.E.2d 144 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). These factors are: "(1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice resulting from the delay." *Id.* at 231, 433 S.E.2d at 156 (citing *Barker v. Wingo*, 407 U.S. 514, 33 L. Ed. 2d 101 (1972)).

A balancing of these factors persuades us that defendant's constitutional right to a speedy trial was not violated in this case. The length of the delay was some five years and six months from indictment to defendant's second trial. However, only approximately eighteen months passed from the time this Court ordered remand on the first appeal until the time of the second trial. The primary reason for the delay of defendant's case was the defendant's appeal of his first conviction and the requisite appellate process that resulted in the overturning of defendant's conviction in the first trial. On this subject, the Supreme Court has stated:

It is, of course, true that the interests served by appellate review may sometimes stand in opposition to the right to a speedy trial. But, as the Court observed in *United States v. Ewell*, [383 U.S. 116, 121, 15 L. Ed. 2d 627, 631 (1966)]:

"It has long been the rule that when a defendant obtains a reversal of a prior, unsatisfied conviction, he may be retried in the normal course of events. . . . [This rule] has been thought wise because it protects the societal interest in trying people accused of crime, rather than granting them immunization because of legal error at a previous trial, and because it enhances the probability that appellate courts will be vigilant to strike down previous convictions that are tainted with reversible error. . . . These policies, so carefully preserved in this Court's interpretation given the Double Jeopardy Clause, would be seriously undercut by [an] interpretation given the Speedy Trial Clause [that raised a Sixth Amendment obstacle to retrial following successful attack on conviction]."

*United States v. Loud Hawk*, 474 U.S. 302, 313, 88 L. Ed. 2d 640, 653 (1986) (alterations in original). The only prejudice defendant attributes to the alleged delay was the unavailability of Stanley Aiken, a witness for the prosecution in the first trial who died before the second trial. Nonetheless, Aiken's prior testimony, including cross-examination by the defendant, was read into the record at the second trial pursuant to the prosecution's request. We conclude that defendant's Sixth Amendment right to a speedy trial was not violated. This assignment of error is without merit.

For the foregoing reasons, we hold that defendant received a fair trial, free of prejudicial error.

NO ERROR.