STATE OF NORTH CAROLINA v. LARRY D. STANFIELD

No. COA98-1160

(Filed 7 September 1999)

**1. Evidence— not an expert—testimony about experience—belated recollections**

The trial court did not err in a robbery case by allowing the testimony of a detective, who was not testifying as an expert, regarding the belated recollection process of trauma victims because he was relating his own experience instead of stating an opinion. Further, the detective did not suggest any reasons why belated recollections occurred, he did not vouch for the accuracy of such recollections, and he gave no opinion as to the credibility of the victim-witnesses.

**2. Evidence— cross-examination of defendant—robbery—prior convictions—no plain error**

The trial court did not commit plain error in a robbery case when it permitted the State to cross-examine defendant about his prior convictions for possession of cocaine because although some of the forms of the questions were objectionable, the substance of the questions were appropriate since the prosecutor limited his inquiry to the facts supporting the conviction without eliciting extraneous prejudicial details.

**3. Evidence— cross-examination of defendant—robbery—defendant's attitude towards criminal laws in general—no plain error**

The trial court did not commit plain error in a robbery case by permitting the State to cross-examine defendant about his atti-

tude concerning the esteem that he holds for criminal laws in general because even if this evidence was inadmissible, defendant failed to show that a different result would have been reached but for the error, or that the error was so fundamental as to result in a miscarriage of justice.

**4. Criminal Law— codefendant pled guilty—mistrial not required**

The trial court did not err in a robbery case by failing to declare a mistrial after a codefendant pled guilty outside of the presence of the jury because when the jury returned, the trial court gave the pattern jury instruction that the codefendant's case was no longer before the jury, its disposition was of no concern to them, and their deliberations as to defendant should not be affected in any way.

**5. Constitutional Law— self-incrimination—robbery—acting in concert—codefendant not required to testify**

The trial court did not err in a robbery case when it did not allow defendant to call his codefendant to testify after the codefendant pled guilty outside the presence of the jury and claimed he would invoke his Fifth Amendment privilege not to incriminate himself if called as a witness because defendant did not proffer the evidence he sought to elicit from his codefendant and merely wanted the jury to speculate. In addition, the fact that defendant was being tried on the theory of acting in concert meant the codefendant's admission of his involvement would not exonerate defendant.

**6. Evidence— prior crime or act—codefendant—harmless error**

Although the trial court erred in a robbery trial by admitting irrelevant evidence of a codefendant's prior bad acts involving drug dealing after the codefendant pled guilty, it was harmless error in light of the substantive evidence against defendant.

**7. Robbery— motion to dismiss—acting in concert**

The trial court did not err in a robbery case based on the theory of acting in concert by failing to grant defendant's motion to dismiss because viewed in the light most favorable to the State, the evidence was sufficient to show that defendant shared a common purpose with his codefendant. While the codefendant used a

STATE v. STANFIELD

[134 N.C. App. 685 (1999)]

gun to take the personal property of both victims, defendant blocked one victim's attempt to exit from his car, defendant told the victim to keep his hands where they could be seen, and defendant took that victim's jewelry.

Appeal by defendant from judgment entered 7 May 1998 by Judge William Z. Wood, Jr., in Forsyth County Superior Court. Heard in the Court of Appeals 10 June 1999.

*Michael F. Easley, Attorney General, by Emmett B. Haywood, Assistant Attorney General, for the State.*

*Tisdale & Menefee, P.A., by Donald K. Tisdale, for defendant-appellant.*

EDMUNDS, Judge.

On 13 July 1997, victims Tyrone Campbell (Campbell) and Reggie McKinney (McKinney) drove to the home of LuWanda Corn in Winston-Salem. Campbell and McKinney remained in the car while Campbell, the driver, began talking to Ms. Corn. Co-defendant Cory Beck (Beck), who was defendant's brother and was also known as Cory Stanfield, was on the porch of the Corn home. After the conversation between Corn and Campbell had continued for a few minutes, Beck yelled to Campbell and McKinney, asking if they had any "weed." When McKinney answered in the negative, Beck approached the driver's side of the car. Interrupting Campbell's conversation with Corn, Beck pulled a gun on the two men in the car and demanded their jewelry. Before McKinney and Campbell were able to comply, defendant walked up to the passenger side door, said "What's up? What's up?," and told McKinney to keep his hands where they could be seen. He stood against the side of the car so that McKinney could not open the door to run. Campbell surrendered some rings he was wearing to Beck, who hit Campbell with his pistol. McKinney told police after the robbery and again at trial that he handed his watch and gold necklace to Beck. However, Campbell initially told police that McKinney handed his (McKinney's) jewelry to defendant Stanfield, but later testified at trial that he did not know to whom McKinney handed his watch and necklace, though he added that Beck reached into the car. Beck told Campbell and McKinney not to look at him, to leave, and not to return or call the police. The victims left but called the police. McKinney later picked defendant out of a photo lineup and identified him at trial.

**[1]** Defendant's first assignment of error pertains to discrepancies between statements made by McKinney and Campbell. McKinney's trial testimony also included some detail not in his written statement, e.g., that, during the robbery, defendant approached the car saying, "What's up? What's up?," then told McKinney to keep his hands where they could be seen. After the investigating detective testified as to the written statement taken from McKinney and after defense counsel elicited on cross-examination the discrepancies between the victims' statements, the prosecution asked the following series of questions on redirect examination:

Q. Okay. What has been your experience with trauma victims, Officer Tollie?

A. It's been—

[overruled objection]

A. It's been my experience [and] training both that with trauma victims often facts about an event may occur—may come back to them several hours or even several days after it's over and they calm down. As a matter of fact, it's my procedure in dealing with someone that is a victim of a violent crime that I leave my card with my number on it stating to them, [i]f you remember something tomorrow or next week that you didn't tell me tonight, feel free to call and I'll take it and annotate it to my report.

Defendant characterizes this testimony by the detective as expert testimony regarding the recollection process of trauma victims and claims that the court erred in admitting this testimony when the witness had not been qualified as an expert. Defendant also asserts this testimony is a statement of the detective's opinion as to the credibility of the witnesses. We disagree. The law in North Carolina is settled that an expert may not express an opinion as to the believability of another witness. In *State v. Aguallo*, 318 N.C. 590, 599, 350 S.E.2d 76, 81 (1986), during a first-degree rape trial, a pediatrician stated, "I think [the victim is] believable." The *Aguallo* Court applied *State v. Heath*, 316 N.C. 337, 340, 341 S.E.2d 565, 567-68 (1986), in which our Supreme Court stated that the official commentary of Rule 608 of the North Carolina Rules of Evidence establishes that " 'expert testimony on the credibility of a witness is not admissible.' " In *Heath*, after being asked her opinion as to whether a mental condition could have caused the witness to fabricate a story, the witness' psychologist responded, "There is nothing in the record or current behavior that

indicates that she has a record of lying." *Id.* Our Supreme Court held that this statement was improper expert testimony that bolstered the credibility of the witness. *See id.*

In contrast, even assuming the detective was testifying as an expert in this portion of his testimony (he had not been formally qual-ified or tendered as an expert but testified that he had investigated between 350 and 375 incidents involving trauma), he was not stating an opinion, but was instead relating his experience. His testimony was a recitation of the procedure he followed when working with trauma victims and the reason he followed it. The officer did not sug-gest any reason such belated recollection occurs, nor did he vouch for the accuracy of such recollection. Unlike the cases cited above, this testimony contained no opinion as to the credibility of the wit-ness. This assignment of error is overruled.

**[2]** Defendant next argues that the trial court committed plain error when it permitted the State, when cross-examining defendant about his prior convictions, to inquire into details that went beyond the nature of the crime, time and place of conviction, and punishment imposed. *See State v. Bishop*, 346 N.C. 365, 488 S.E.2d 769 (1997). Because defendant failed to object to this line of questions, he car-ries the burden of showing "(i) that a different result probably would have been reached but for the error or (ii) that the error was so fun-damental as to result in a miscarriage of justice or denial of a fair trial." *Id.* at 385, 488 S.E.2d at 779. The particular portion of cross-examination to which defendant now objects is as follows:

Q. And you've been convicted of possession with intent to sell and deliver cocaine?

A. Well, I got convicted of simple possession.

Q. I'm sorry. I thought you told [defense counsel] you were con-victed of possession with intent to sell.

A. That's what I was charged with. It cost me several thousand dollars. I got it down to simple possession.

Q. So you plea bargained that case?

A. Yes, sir, I did.

Q. Is that the one in Danville, Virginia, in 1996?

A. Yes, sir, it is.

**STATE v. STANFIELD**

[134 N.C. App. 685 (1999)]

Q. And you were put on probation?

A. Yes, sir, I was.

Q. For how long?

A. I can't even remember.

. . . .

Q. . . . And almost within a year you had some more cocaine on you, didn't you?

A. Well, in fact, that charge that I was charged for in '96 that was from, like, four years ago. I had been living in Winston-Salem. They had just—They had just recently caught up with me. And I took a plea bargain.

. . . .

Q. . . . [I]n July of '97, three days before this crime, you were convicted of possession of cocaine again, were you not?

A. What do you mean three days before this crime?

Q. Well, this crime occurred on July 13 of '97.

A. From what I understood this wasn't a crime. It was a simple assault. From what I understand these guys are making up this story.

Q. Okay. Well, from July the 13th of 1997—You were convicted on July 10th of '97 of possession of cocaine, were you not, Mr. Stanfield?

A. On July the 10th?

Q. Yes, sir.

A. Yes, I was.

Q. So, in other words, you ignored your probation from the [Commonwealth] of Virginia; is that correct?

A. Well it was transferred to the state of North Carolina.

Q. But, anyway, you were on probation to stay away from drugs. And from a court order from Virginia, North Carolina, wherever, Mr. Stanfield, you ignored that court order, did you not?

A. Yes, sir.

Q. And got convicted again of the same drug; isn't that right?

A. Yes, sir.

Our review of this transcript satisfies us that the State's questions did not exceed the permissible scope of inquiry concerning defendant's prior convictions. Although some of these questions were objectionable as to form where the prosecutor asked about the underlying facts rather than the conviction itself ("[a]nd almost within a year you had some more cocaine on you, didn't you?"), no objection was made. *See* N.C. Gen. Stat. § 8C-1, Rule 609 (1992). Moreover, the substance of the questions was appropriate. The prosecutor limited his inquiry to the facts supporting the conviction and did not elicit extraneous prejudicial details. *Compare State v. Rathbone*, 78 N.C. App. 58, 336 S.E.2d 702 (1985), *disc. review denied*, 316 N.C. 200, 341 S.E.2d 582 (1986), *with State v. Wilson*, 98 N.C. App. 86, 389 S.E.2d 626 (1990). Where defendant's answers demonstrated confusion or evasion, the prosecutor properly sought clarification. This assignment of error is overruled.

**[3]** Defendant also asserts that the trial court committed plain error by permitting the State to inquire about defendant's attitude concerning the law in general, referring to the following exchange:

Q. . . . So your attitude about the criminal laws of North Carolina or any other state, you don't hold them in any high esteem, do you?

A. Well, selling drugs—First of all, selling drugs is against the law anywhere. So for me to be convicted of selling drugs, I had to have sold the drugs. That's against the law. So same scenario.

Q. Yes, sir. So you don't have any respect for the criminal laws, do you?

A. No, it's not that. It's just what I chose to do at that time.

Defendant did not object to this line of questioning.

Although a party may cross-examine a witness with respect to any evidence that tends to show feeling or bias of the witness with respect to a party or cause, *see State v. McCall*, 31 N.C. App. 543, 230 S.E.2d 195 (1976), "the criminal laws" are neither party nor cause. Nevertheless, assuming *arguendo* that this evidence was inadmissible, defendant has failed to meet his burden of showing (1) that a different result probably would have been reached but for the error

or (2) that the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial. *See Bishop*, 346 N.C. 365, 488 S.E.2d 769. This assignment of error is overruled.

[4] Defendant next asserts that the trial court improperly denied his motion for mistrial after Beck pled guilty outside the presence of the jury. We disagree. "The decision to grant a mistrial is within the trial court's discretion." *State v. Jaynes*, 342 N.C. 249, 280, 464 S.E.2d 448, 467 (1995) (citations omitted), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996). A trial court should grant a mistrial " 'only when there are improprieties in the trial so serious that they substantially and irreparably prejudice the defendant's case and make it impossible for the defendant to receive a fair and impartial verdict.' " *State v. Marlow*, 334 N.C. 273, 287, 432 S.E.2d 275, 283 (1993) (quoting *State v. Laws*, 325 N.C. 81, 105, 381 S.E.2d 609, 623, *sentenced vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990)). "[A] trial court's decision regarding a motion for mistrial will not be disturbed on appeal absent a clear showing that the trial court abused its discretion." *Id*. Here, Beck entered his guilty plea outside the presence of the jury. When the jury returned, the trial judge gave the pattern instruction that the co-defendant's case was no longer before the jury, that its disposition was of no concern to them, and that their deliberations as to defendant should not be affected in any way. The procedure followed by the trial court has been approved by this Court. *See State v. Dewalt*, 16 N.C. App. 546, 192 S.E.2d 665 (1972). This assignment of error is overruled.

[5] Defendant also argues that the trial court committed reversible error by not allowing him to call Beck to testify on his behalf. After Beck pled, the court ascertained in the absence of the jury that, if called as a witness, he would invoke his Fifth Amendment privilege not to incriminate himself. The court then instructed defendant's attorney not to call Beck. Our Supreme Court has admonished trial courts to exercise caution in deciding whether to allow a party to call a witness who will plead the Fifth Amendment.

> [T]here are two difficulties that may arise when a witness is presented and then refuses to testify by asserting his Fifth Amendment privilege. The first is that it permits the party calling the witness to build or support his case out of improper speculation or inferences that the jury may draw from the witness' exercise of the privilege, which cannot be adequately corrected by trial court instruction. The second concern is that it encroaches

upon the constitutional right to confrontation because the presentation of the exercise of the privilege cannot be tested for relevance or value through cross-examination. As a result of these difficulties, "the trial judge must weigh a number of factors in striking a balance between the competing interests." Such a balancing will be left to the discretion of the trial court in determining whether the probative value of the proffered evidence is substantially outweighed by the danger of unfair prejudice in accordance with Rule 403 of the Rules of Evidence.

*State v. Pickens*, 346 N.C. 628, 639, 488 S.E.2d 162, 167-68 (1997) (internal citations omitted). In *Pickens*, the defendant sought to call his former co-defendant (Arrington) to the witness stand. Outside of the jury's presence, Arrington had exercised his Fifth Amendment privilege against self-incrimination, and the defendant alleged it was error to prevent him from calling Arrington to the stand to exercise the privilege before the jury. The defendant wanted to show that Arrington fired the weapon that caused the victim's death; however, our Supreme Court held that the defendant was tried under a theory of acting in concert, making Arrington's assertion of his constitutional privilege "immaterial." Thus, the Court held that the trial court did not abuse its discretion in denying the defendant's request.

Defendant here argues that the trial court abused its discretion by denying defendant's request to call Beck. We disagree. Defendant never made a proffer as to what evidence he sought to elicit from Beck; instead, defendant maintains that he had "the right of having the jury make whatever inferences it might from the assertion by [Beck] of [his] Fifth Amendment rights." In other words, he wanted the jury to speculate in the hope that the speculation might be to his benefit. The trial court weighed a privilege expressly protected by the U.S. Constitution against this nebulous hope and decided correctly. Moreover, defendant, like the defendant in *Pickens*, was being tried under the theory of acting in concert. Because Beck's admission of his own involvement would not exonerate defendant, Beck's claiming his Fifth Amendment privilege was immaterial to defendant's defense. The trial court did not abuse its discretion. This assignment of error is overruled.

**[6]** Defendant next argues that the trial court erred by admitting testimony about the bad acts of his co-defendant Beck after Beck pled guilty. This evidence was elicited during cross-examination of defense witnesses and related to Beck's drug dealing. Because

defendant did not object to this testimony at trial, we review admission of the testimony for plain error. *See Bishop*, 346 N.C. at 385, 488 S.E.2d at 779. Here, the evidence in question was consistent with testimony taken prior to Beck's plea. Nevertheless, once Beck was out of the trial, evidence of his bad acts unrelated to the instant offense had no probative value and could only serve to prejudice defendant. However, we hold that the error in admitting the evidence was harmless. There was substantial other evidence of defendant's guilt, and we see no possibility that a different result could have been reached if this testimony pertaining to the co-defendant had been excluded. This assignment of error is overruled.

**[7]** Finally, defendant contends that the court erred by failing to grant his motion to dismiss at the conclusion of all the evidence. " 'In passing upon a defendant's motion to dismiss, the court must consider the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference.' " *State v. Tucker*, 347 N.C. 235, 243, 490 S.E.2d 559, 563 (quoting *State v. Aikens*, 342 N.C. 567, 573, 467 S.E.2d 99, 103 (1996)), *cert. denied*, 523 U.S. 1061, 140 L. Ed. 2d 649 (1998). The State's case against defendant was based on a theory of acting in concert.

> Where the state seeks to convict a defendant using the principle of concerted action, that this defendant did some act forming a part of the crime charged would be strong evidence that he was acting together with another who did other acts leading toward the crimes' commission. That which is essentially evidence of the existence of concerted action should not, however, be elevated to the status of an essential element of the principle. Evidence of the existence of concerted action may come from other facts. It is not, therefore, necessary for a defendant to do any particular act constituting at least part of a crime in order to be convicted of that crime under the concerted action principle so long as he is present at the scene of the crime and the evidence is sufficient to show he is acting together with another who does the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime.

*State v. Joyner*, 297 N.C. 349, 356-57, 255 S.E.2d 390, 395 (1979).

Viewed in the light most favorable to the State, the evidence showed that Beck used a gun while taking the personal property of Campbell and McKinney. McKinney testified that defendant blocked his exit from the car, told him to keep his hands where they could be

seen, and took his jewelry. This is sufficient evidence to establish beyond a reasonable doubt that defendant shared a common purpose with Beck. Accordingly, the trial court properly denied defendant's motion. This assignment of error is overruled.

No error.

Judges WALKER and McGEE concur.