HENRY ANGELO & SONS, INC. v. PROPERTY DEVELOPMENT CORPORA-
TION, RIVERSIDE ASSOCIATES, A LIMITED PARTNERSHIP, GLEN F.
LAMBERT, STANLEY A. GERTZMAN, W. H. McMULLEN, JR., AND NA-
TIONAL BONDING AND ACCIDENT INSURANCE COMPANY

ATLANTIC GLASS COMPANY v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

ATLANTIC GLASS COMPANY v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

BAKER-MITCHELL COMPANY v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

BAKER-MITCHELL COMPANY v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

BECKER BUILDERS SUPPLY CO. v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

E. W. GODWIN'S SONS, INC. v. PROPERTY DEVELOPMENT CORPORATION,
ET AL.

E. W. GODWIN'S SONS, INC. v. PROPERTY DEVELOPMENT CORPORATION,
ET AL.

B. A. HOFT & ASSOCIATES, INC. v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

LEE'S PAINT & HARDWARE CO. v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

LONGLEY SUPPLY COMPANY v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

LOWE'S OF WILMINGTON, INC. v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

LOWE'S OF WILMINGTON, INC. v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

MARSH FURNITURE COMPANY v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

MARSH FURNITURE COMPANY v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

JOHN H. SMITH D/B/A SMITH LAWN SERVICE v. PROPERTY DEVELOPMENT
CORPORATION, ET AL.

SOUTHEASTERN SHELTER CORPORATION v. PROPERTY DEVELOPMENT
CORPORATION, ET AL.

TILECRAFT DISTRIBUTORS, INC. v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

TRASH REMOVAL SERVICE, INC. v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

TRASH REMOVAL SERVICE, INC. v. PROPERTY DEVELOPMENT CORPORA-
TION, ET AL.

No. 825SC475

(Filed 6 September 1983)

**Principal and Surety § 10— bonding company's right to reimbursement by indem-
nitors under an indemnification agreement**

G.S. 58-54.23 did not prevent a bonding company from seeking reimburse-
ment from its indemnitors under an indemnification agreement made before
the bonding company agreed to bond a general contractor. G.S. 58-54.20, G.S.
58-54.21, G.S. 58-54.22 and G.S. 58-3.

APPEAL by defendant National Bonding and Accident In-
surance Company from *Strickland, Judge.* Order entered 31
December 1981 in Superior Court, NEW HANOVER County. Heard
in the Court of Appeals 15 March 1983.

These twenty suits, consolidated for trial and appeal pur-
poses, were filed by subcontractors and suppliers to recover for
labor and materials furnished to two construction projects in
Wilmington; but none of the plaintiffs or the general contractor
primarily responsible to them are involved in this appeal, which
concerns only the secondary defendant, the appellant National

Bonding and Accident Insurance Company, and its indemnitors, Stanley A. Gertzman, Jeri A. Gertzman and William H. McMullen, Jr., the appellees. The claims of the suppliers and subcontractors against the general contractor have been settled and paid off by the bonding company in accord with the bonds given for the contractor; the bonding company obtained a default judgment against the contractor for monies so paid out; and the only matter remaining for adjudication is the bonding company's right to reimbursement by the appellees under an indemnification agreement made between them before the bonding company agreed to bond the general contractor in the first place.

The construction projects involved the renovation and refurbishment of two old apartment complexes under the authority and financial sponsorship of the United States Department of Housing and Urban Development. The general contractor for both projects was Property Development Corporation, whose original stockholders were Stanley A. Gertzman, Glen F. Lambert and William H. McMullen, Jr., Lambert being President of the company, McMullen Secretary, and Gertzman the Registered Agent. The owner of one complex was a partnership known as Riverside Associates, the general partners of which were the same three persons. The owner of the other complex was Sunbelt Corporation, whose stockholders were Property Development Corporation, Gertzman, Lambert and McMullen. Gertzman and McMullen are both Charlotte lawyers and Lambert was then a Florida real estate man and investor; if either of them had any experience in construction, the record does not reveal it. All the above enterprises were formed in anticipation of participating in these speculative projects, the purchase of the properties involved was contingent upon HUD-guaranteed financing being obtained, and the transactions were not closed until it was.

Before HUD approved the two projects, of course, all of its many requirements had to be complied with. One requirement, the last one met by the investors, was that payment and performance surety bonds for the general contractor be supplied. The task of getting these bonds was assumed by Mr. Lambert and proved to be quite difficult. Before the bonds were eventually obtained, Lambert had contacted a number of agencies or brokers in different places and Gertzman and McMullen had inquired about the delay many times. Finally, after making trips to Atlanta and

Minneapolis, Lambert and brokers from those two cities con-
tacted National Bonding at its main office in St. Louis and that
company agreed to serve as surety for the two projects if the
three investors — Gertzman, Lambert and McMullen — and their
wives, as well as the general contractor, would personally indem-
nify it for any and all costs and expenses that it incurred as a con-
sequence thereof. These terms were accepted by the investors
and a formal application and indemnity agreement bearing the
notarized signatures of the six individuals involved, as well as the
President and Secretary of Property Development Corporation,
was delivered to National Bonding; after which the surety bonds
were issued, HUD approved both projects and guaranteed the fi-
nancing, the apartment purchase transactions were closed, and
construction on the projects was begun.

In the course of construction, however, the plaintiff subcon-
tractors and suppliers were not paid by the contractor, and upon
the bonding company being made a secondary defendant in these
cases, it cross-claimed against the Gertzmans and McMullens.
Later a voluntary dismissal as to Mrs. McMullen was taken upon
her alleging that she did not sign the indemnification agreement.
The Gertzmans and McMullen admitted executing the indemnifi-
cation agreement, but moved to dismiss the bonding company's
claim against them under the provisions of G.S. 58-54.23, on the
ground that the transaction involved was insurance business con-
ducted in the state, and National Bonding had not obtained a cer-
tificate of authority from the Commissioner of Insurance, as the
statute required. The bonding company also moved for summary
judgment against the indemnitors.

Upon the various motions being heard, the evidence in-
disputably showed that (a) the bonding company issued the surety
bonds for the general contractor, guaranteeing thereby to pay the
contractor's debts to suppliers and subcontractors if it did not; (b)
it had transacted no other business of any kind in the state and
had no agencies, employees, or officers here; (c) it had received no
certificate of authority from the North Carolina Department of In-
surance; (d) the appellees executed the indemnification agreement,
promising thereby to repay the bonding company for any costs
and expenses that it incurred because of giving the bonds; and (e)
the bonding company had incurred costs and expenses in these

cases in the total amount of $264,673.87 because of the contractor's default.

In reliance upon G.S. 58-54.23, which in pertinent part reads as follows —

> . . . no company *transacting insurance business in this State* without a certificate of authority shall be permitted to maintain an action at law or in equity in any court of this State to enforce any right, claim or demand arising out of the transaction of such business until such company shall have obtained a certificate of authority

[Emphasis supplied], an order of summary judgment dismissing National Bonding's cross-claim against the appellees for indemnification was entered.

*Nichols, Caffrey, Hill, Evans & Murrelle, by William L. Stocks, for defendant appellant National Bonding and Accident Insurance Company.*

*Poisson, Barnhill & Britt, by L. J. Poisson, Jr., for defendant appellees, Stanley A. Gertzman, Jeri A. Gertzman and William H. McMullen, Jr.*

PHILLIPS, Judge.

G.S. 58-54.23 and the several other statutes in Article 3C of Chapter 58 that it depends upon and relates to have no application to this case and it was error to close the court to National Bonding's cross-claims against the appellee indemnitors under authority of it. Since these are confiscatory and punitive statutes in fundamental derogation of the common law — statutes which abrogate the right of those affected to sue, as basic a right as the common law knows, and authorize the imposition of penalties in the amount of $1,000 a day — they, of course, cannot and will not be extended beyond their express terms by us. *Ellington v. Bradford*, 242 N.C. 159, 86 S.E. 2d 925 (1955). The statutes concern only "unauthorized insurers" who write "contracts of insurance" or otherwise transact "insurance business" in the state; they have nothing whatever to do with those who sign payment and performance bonds for building contractors and seek to obtain reimbursement from indemnitors who induce them to issue bonds by promising to hold them harmless with respect thereto.

Before examining the statutes that were deemed to apply to appellant's cross-claims, however, a resort to the ABC's of insurance and suretyship law would seem to be in order. In the law, insurance and suretyship are not synonymous terms, and if any appellate court anywhere has ever so held, our research has failed to disclose it. They involve different functions, relationships, rights and obligations; and have been recognized and treated by the profession as distinctive fields of law for generations. *See* 44, 45 and 46 C.J.S. *Insurance;* 72 C.J.S. *Principal and Surety;* 32 and 33 C.J. *Insurance;* 50 C.J. *Principal and Surety.* "While insurance contracts are in many respects similar to surety contracts, there is a very wide difference between them." 44 C.J.S. *Insurance* § 1, p. 473. The statutory provisions that control and regulate insurance in this state are contained in Chapter 58 of the General Statutes entitled "Insurance"; those that regulate suretyship in Chapter 26 entitled "Suretyship."

Insurance is "[a] contract whereby, for a stipulated consideration, one party undertakes to compensate the other for loss on a specified subject by specified perils. The party agreeing to make the compensation is usually called the 'insurer' or 'underwriter;' the other, the 'insured' or 'assured;' the agreed consideration, the 'premium;' the written contract, a 'policy;' the events insured against, 'risks' or 'perils;' and the subject, right, or interest to be protected, the 'insurable interest.'" Black's Law Dictionary 943 (rev. 4th ed. 1968).

"A contract of insurance is an agreement by which the insurer is bound to pay money or its equivalent or to do some act of value to the insured upon, and as an indemnity or reimbursement for the destruction, loss, or injury of something in which the other party has an interest." G.S. 58-3.

A surety is one "who engages to be answerable for the debt, default or miscarriage of another." Pingrey, Treatise on the Law of Suretyship and Guaranty 2 (1901).

A contract of suretyship is "[a] lending of credit to aid a principal having insufficient credit of his own; the one expected to pay, having the primary obligation, being the 'principal,' and the one bound to pay, if the principal does not, being the 'surety.'" Black's Law Dictionary 1611 (rev. 4th ed. 1968).

"In law, suretyship is a lending of credit to aid a principal who has insufficient credit of his own, and is a direct contract to pay the principal's debt or perform his obligation in case of his default, . . ." 83 C.J.S. *Suretyship,* p. 911.

The statutes that the appellees contend rendered their agreement to indemnify National Bonding unenforceable in the courts of this state are all in Article 3C of Chapter 58 of the General Statutes. Article 3C, entitled "Unauthorized Insurers," contains six statutes. Two of them—G.S. 58-54.24, empowering the Commissioner to enjoin unauthorized companies, and G.S. 58-54.25, permitting service of process on the Secretary of State as agent for unauthorized companies—are irrelevant to this appeal; and a third—G.S. 58-54.23, which deprives unauthorized insurers of the right to sue in our courts—is already quoted above in pertinent part. G.S. 58-54.20, which enumerates the acts forbidden, is hereafter quoted in its entirety, and so much of the other two statutes as is relevant to the question before us:

§ 58-54.20.  Purpose of Article.

It is the purpose of this Article to abate and prevent the practices of unauthorized insurers within the State of North Carolina, and to provide methods for effectively enforcing the laws of this State against such practices. The General Assembly finds that there is within this State a substantial amount of insurance business being transacted by insurers who have not complied with the laws of this State and have not been authorized by the Commissioner of Insurance to do business. These practices by unauthorized insurers are deemed to be harmful and contrary to public welfare of the citizens of this State. The difficulties which arise from the acts and practices of unauthorized insurers is compounded by the fact that such companies are licensed in foreign jurisdictions and conduct a long-range business without having personal representatives or agents in proximity to insureds. The General Assembly further declares that it is a subject of vital public interest to the State that unlicensed and unauthorized companies have been and are now engaged in soliciting by way of direct mail and other advertising media, insurance risks within this State, and that such companies enjoy the many benefits and privileges provided by the State as well as the protection af-

forded to citizens under exercise of the police powers of the State, without themselves being subject to the laws designed to protect the insurance consuming public. The provisions of this Article are in addition to all other statutory provisions of Chapter 58 relating to unauthorized insurers and do not replace, alter, modify or repeal such existing provisions.

§ 58-54.21. Transacting business without certificate of authority prohibited; exceptions

Except as hereinafter provided, it shall be unlawful for any company to enter into a contract of insurance as an insurer or to transact insurance business in this State as set forth in G.S. 58-54.22 of this Article, without a certificate of authority issued by the Commissioner of Insurance.

§ 58-54.22. Acts or transactions deemed to constitute transacting insurance business in this State.

The following acts, if performed in this State, shall be included among those deemed to constitute transacting insurance business in this State:

(1) a. Maintaining any agency or office where any acts in furtherance of an insurance business are transacted, including, but not limited to the execution of contracts of insurance with citizens of this or any other state;

b. Maintaining files or records of contracts of insurance; or

c. Receiving payments of premiums for contracts of insurance.

(2) Likewise, any of the following acts in this State, whether effected by mail or otherwise by an unauthorized insurer, is included among those deemed to constitute transacting insurance business in this State:

a. The issuance or delivery of contracts of insurance to residents of this State or to corporations authorized to do business therein;

    b. The soliciting of applications for contracts of insurance through the use of the United States mail or any other media, method or device;

    c. The collections of premiums, membership fees, assessments or other considerations for such contracts; or

    d. The transaction of any matters prior to or subsequent to the execution of such contracts in contemplation thereof or arising out of them.

Any company violating any of the provisions of this section, by doing any of the foregoing acts or transactions while not authorized to do business within this State, shall be subject to penalty of not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000) for each offense; . . . Provided, that each day in which a violation occurs shall constitute a separate offense.

A reading of these provisions makes it obvious that they do not apply to this case. They say nothing of surety performance bonds, or contracts to pay the debts of others, but mention only insurers, contracts of insurance, and transacting insurance business. Their purpose, plainly stated, is to protect unwary North Carolinians against the overreaching machinations and solicitations of unauthorized out-of-state insurers in selling insurance policies; certainly, their purpose is not to immunize from liability indemnitors who travel to other states and induce foreign sureties to bond fledgling North Carolina building contractors that have no credit of their own and that require bonds to stay in business. The acts prohibited and punishable by the statutes are also too explicitly stated to be easily confused with others or misunderstood; in essence, they are soliciting insurance contracts, and contracting to pay insureds or their beneficiaries under insurance policies. Agreeing to stand good for the debts of others, as happened here, is not condemned, and we know of no reason why it should be.

The appellees contend that the terms "contracts of insurance," "insurer," and "insurance business," as used in the statute are interchangeable with "surety," "contracts of suretyship," and "surety bonding business" because of language contained in two decisions of the North Carolina Supreme Court.

In the first decision, *Guilford Lumber Mfg. Co. v. Johnson,* 177 N.C. 45, 97 S.E. 732 (1919), a suit by suppliers and laborers against a defaulting building contractor and his performance bond, the Court, in strictly construing the bond against the surety, used this language: ". . . guarantee or indemnity bonds of this character are regarded in this jurisdiction and under well-considered authority elsewhere as being *in the nature of insurance contracts* and, for like reasons, subject to similar rules of interpretation." (Emphasis supplied.) *Id.* at 48, 97 S.E. at 734. But this, of course, no more justifies the conclusion that sureties are insurers and performance bonds are contracts of insurance than does the commonly known fact that sheep are somewhat like goats justify the conclusion that sheep are goats.

The second, *Maxwell, Comr. of Revenue v. Southern Fidelity Mutual Ins. Co.,* 217 N.C. 762, 765-66, 9 S.E. 2d 428, 431 (1940), contains the following:

> "The law does not have the same solicitude for corporations engaged in giving indemnity bonds for profit as it does for the individual surety who voluntarily undertakes to answer for the obligations of another. Although calling themselves sureties, such corporations are in fact insurers, and in determining their rights and liabilities, the rules peculiar to suretyship do not apply." See 193 N.C. 710.

Why the Court directed us to 193 N.C. 710 we have been unable to ascertain, as that decision (*Forest City Building and Loan Association v. Davis*) contains nothing whatever that is relevant to either that case or this, or to the remarks quoted. Nor have we been able to deduce why the quoted remarks were made in the first place. In that suit by a creditor against the debtor's surety company, the only question before the Court was whether the surety was discharged when the creditor took additional security from the debtor and extended the time of payments. The answer and decision that the surety was not discharged was dictated, as the Court, after many digressions, recognized, by the fact that the surety bond expressly gave the Commissioner of Revenue the right to take other or additional security from the distributor as he saw fit. Rhetoric so random, irrelevant, and unsound is no basis for this or any other court deciding that the General Assembly had surety bonds in mind when it undertook to curb un-

authorized insurers by enacting Article 3C of Chapter 58 of the General Statutes.

But even if the payment and performance bonds in this case fell within the purview of Article 3C, the order dismissing the bonding company's cross-claims would have still been without authority. This is because G.S. 58-54.23 deprives unauthorized insurers only of the right "to maintain an action at law or in equity" in regard to their prohibited business, it says nothing at all about maintaining cross-claims against co-defendants. The appellant has maintained no action against anybody, least of all the creditors for whose benefit the bonds were given; it has only defended the twenty actions brought against it by the contractor's creditors and sought to enforce cross-claims against its co-defendants — not because of the bonds or anything in them, but because of the appellees' separate promises of indemnity. The words, "action at law or in equity," designed only to prevent unauthorized insurers from suing their victimized policyholders or beneficiaries, cannot be interpreted to prevent cross-claims among defendants sued by others.

But this decision does not rest on just the rules of statutory construction. Just and equitable principles fundamental to our jurisprudence require that these appellees not be exonerated from liability in this case; for those who willingly gather unto themselves all the fruits of bargains fairly made, as the appellees did here, but look for technical loopholes through which to squirm when called upon to meet the burdens agreed to cannot and should not be aided by our law. Having sought out the appellant in a distant state when no one here would bond their contractor, with the entire real estate purchase and construction project hanging in the balance; having induced it to execute the bonds by solemnly promising to repay any losses sustained thereby, and enterprises that they owned having benefitted therefrom; the appellees will not be heard by this Court to claim that they are immune from liability because the appellant obtained no certificate in this state before standing good for and paying what, in essence, were their debts! The utter absurdity of the contention requires no demonstration; it offends every principle of equity and good morals, and will not be heeded by this court. And under fundamental principles of law, we are not obliged to. "It is a rule of general application that, where a bond has accomplished the pur-

pose for which it was given, or the principal has derived benefit from it, both the principal and sureties are estopped to deny liability on the bond on any ground whatever." 31 C.J.S. *Estoppel* § 110(4), p. 571. *See also* 21 C.J. *Estoppel* § 213, p. 1211 and the cases there cited. *A fortiori*, since the principal and surety are estopped, the indemnitors, for whose benefit the projects were conceived and promoted, from aught that the record shows, are likewise estopped.

Since the appellees admit executing the indemnity agreement and both the contractor's default and the monies paid out by the bonding company before this appeal was taken have already been judicially established, upon remand the bonding company's motion for summary judgment, not yet ruled on apparently, should be allowed, after the expenses incurred by the bonding company because of this appeal have been ascertained.

Reversed and remanded.

Judges ARNOLD and BECTON concur.