JERRY GIBBS, LARRY GIBBS, GARY BARNETTE, ROLAND STOTESBERRY, MATTIE BERRY, ANNA MAE GIBBS, CHARLES GIBBS, REBECCA GIBBS, REGINA GIBBS, ALISON ELLIS, GARY ELLIS, BARBARA MEEKINS, MACLYN GIBBS, ELLIS GIBBS, JAMES GIBBS, MARK DODGE, MARY GIBBS, BARBARA SPENCER, SHERLIN SPENCER, JOHN HERINA, PEGGY GRANT, GLENN JARVIS, ODESA JARVIS, AND CALVIN B. DAVIS, INDIVIDUALLY AND ON BEHALF OF HYDE COUNTY, PLAINTIFFS v. TROY LANE MAYO, D. SCOTT COBLE, WAYNE TEETER, BARBARA DEESE, WILLIE GIBBS, CALVIN GIBBS, JR., AND NORTH CAROLINA COUNTIES LIABILITY AND PROPERTY INSURANCE POOL FUND, DEFENDANTS

No. COA03-290

(Filed 17 February 2004)

**1. Public Officials and Employees— chairman of county commissioners—contracts for renovations—conflict of interest law—personal benefit**

The trial court abused its discretion by failing to grant plaintiffs' motion for judgment notwithstanding the verdict on the issue of damages toward defendant chairman of the board of county commissioners individually arising out of contracts for renovations to the courthouse and health department entered into with a separate individual although the chairman and his employees actually performed all of the work because: (1) the conflict of interest law under N.C.G.S. § 14-234(a) provides that an elected official entrusted with the business of others cannot be allowed to make such business an object of pecuniary profit to himself; and (2) defendant must suffer the loss incident upon his breach and is required to return to the county the full amount of monies he received from both contracts as he was an elected commissioner and entered into these contracts for his own benefit in direct violation of the conflict of interest law of North Carolina.

**2. Public Officials and Employees— county commissioners— contracts for renovations—conflict of interest law— knowledge**

Although the trial court did not abuse its discretion by denying plaintiffs' motion for judgment notwithstanding the verdict on the issue of damages toward defendant remaining board of county commissioners arising out of contracts for renovations to the courthouse and health department entered into with a separate individual when the chairman and his employees actually

performed all of the work, the trial court abused its discretion by failing to grant the remaining commissioners' motions for directed verdict, because: (1) there is no evidence in the record that the remaining commissioners entered into any contract for their own benefit or that they were privately interested in this contract or the profits therefrom; (2) none of the remaining commissioners received any individual benefit from this contract nor did they receive any financial gain; and (3) knowledge alone is not enough to trigger liability under the conflict of interest law.

**3. Damages and Remedies— punitive damages—bifurcated issue**

The trial court did not err by dismissing plaintiffs' punitive damages claim ex mero motu in a case where the issue of punitive damages was bifurcated, because: (1) the evidence plaintiffs relied upon to prove the compensatory damages claim was identical to the evidence they would have relied on to prove their punitive damages claim; (2) plaintiffs introduced the totality of their evidence during the compensatory damages portion of the trial to establish liability; (3) the only new evidence plaintiffs may have presented in the punitive damages stage was the amount of punitive damages they sought; and (4) the trial court properly ruled that plaintiffs could not prevail on the punitive damages issue based on the evidence, particularly since defendant was required to disgorge the entire amount of monies he received from two projects.

**4. Public Officials and Employees— conflict of interest—evidence of reasonable value inadmissible**

The trial court erred by permitting defendants to question witnesses concerning the costs incurred and reasonable value of work done by defendant chairman of county commissioners in performing the work on the courthouse and health department projects, because: (1) the jury found that defendant violated North Carolina's conflict of interest law by entering into these contracts as an elected commissioner; and (2) defendant is liable for the full amount of monies received for the projects.

**5. Costs— attorney fees provided by county—defense of county commissioners**

The trial court erred by refusing to allow evidence of attorney fees expended by the county for the defense of defendant county commissioners, because: (1) defendant chairman of county com-

missioners' actions were outside the scope of his office meaning he was not entitled to have the county provide for his defense under N.C.G.S. § 160A-167(a); and (2) the remaining commissioners' actions, combined with their knowledge of defendant chairman's actions, raise questions as to whether they were within the scope of their office.

**6. Evidence— hearsay—unavailable witness—statements against interest—catchall exception**

The trial court did not abuse its discretion by refusing to admit the testimony of a former county manager made at an earlier hearing in a different case and statements made to an SBI agent after the former county manager asserted his Fifth Amendment privilege against self-incrimination, because: (1) although the former county manager was unavailable under N.C.G.S. § 8C-1, Rule 804(a)(1) based on his invocation of the right against self-incrimination, his statements did not fall within the exceptions under Rule 804(b)(1) when the issues from the previous case from which plaintiffs wanted to introduce testimony were far different from the issues here; (2) his statements during his deposition and testimony did not meet the N.C.G.S. § 8C-1, Rule 804(b)(3) statements against interest exception when he avoided any and all incriminating statements against himself by repeatedly asserting his Fifth Amendment privilege against self-incrimination; and (3) the statements were not admissible under the N.C.G.S. § 8C-1, Rule 804(b)(5) catchall exception when the motivation for his statements was to exculpate himself from any wrongdoing by attempting to blame it on the board of commissioners, and the statements did not meet the circumstantial guarantees of trustworthiness when he was strongly motivated to protect his own interests.

**7. Constitutional Law— assertion of Fifth Amendment privilege against self-incrimination—prejudicial effect of speculation**

Although the trial court erred by permitting a former county manager to repeatedly plead his Fifth Amendment privilege against self-incrimination when the probative value of his testimony did not substantially outweigh the prejudicial effect of allowing the jury to improperly speculate and draw inappropriate conclusions from the witness's assertion of his right, defendants failed to show prejudicial error when other substantial evidence showed that defendant chairman of the board of commissioners

entered into the pertinent contracts in violation of the conflict of interest law, that defendant received virtually all the benefits of these contracts, and that the other commissioners were aware of these actions.

**8. Public Officers and Employees— county commissioners— wrongfully spent public funds—directed verdict**

The trial court erred by denying defendant remaining county commissioners' motions for directed verdict for plaintiffs' claims under N.C.G.S. § 128-10 and under the common law arising out of an action to recover wrongfully spent public funds against municipal officers, because: (1) N.C.G.S. § 128-10 requires that for a person to be liable under this statute, he must be an official liable on his bond, and the statute was not intended to include the type of insurance contract at bar; (2) there is no common law claim since elected officials could potentially risk their personal assets every time they voted on a controversial issue or exercised their political judgment in the expenditure of public funds, and actions to recover wrongfully spent public funds against municipal officers are statutory; and (3) defendants did not violate North Carolina's conflict of interest law.

Appeals by plaintiffs and defendants Troy Lane Mayo, D. Scott Coble, Wayne Teeter, Barbara Deese, and Willie Gibbs from orders and judgment entered 20 August 2002 by Judge William C. Griffin, Jr., in Hyde County Superior Court. Heard in the Court of Appeals 20 November 2003.

*Carter, Archie, Hassell & Singleton, L.L.P., by Sid Hassell, Jr., and Davis & Davis, by Geo. Thomas Davis, Jr., for plaintiffs-appellants.*

*The Twiford Law Firm, P.C., by Edward A. O'Neal and David R. Pureza, for defendant-appellee/cross-appellant Troy Lane Mayo.*

*Pritchett & Burch, PLLC, by Lloyd C. Smith, Jr., and Lars P. Simonsen, for defendants-appellees/cross-appellants D. Scott Coble, Wayne Teeter, Barbara Deese, and Willie Gibbs.*

TYSON, Judge.

The individually listed plaintiffs (collectively, "plaintiffs") are residents and taxpayers of Hyde County. They appeal from the 20 August 2002 orders denying their motions for a judgment notwithstanding the

GIBBS v. MAYO

[162 N.C. App. 549 (2004)]

verdict and new trial. Plaintiffs also appeal from the judgment entered 20 August 2002. Troy Lane Mayo ("Mayo"), D. Scott Coble ("Coble"), Wayne Teeter ("Teeter"), Barbara Deese ("Deese"), and Willie Gibbs ("Gibbs") (collectively "defendants") were duly elected members of the Hyde County Board of Commissioners (the "Board"). They cross-appeal from the judgment entered 20 August 2002.

## I. Background

In 1997, the Board became aware of deteriorating physical conditions of the Hyde County Courthouse ("courthouse"). The walls in the tax office on the first floor had pulled away from the ceiling and the floor had become "bouncey." Moisture had caused books, papers, and furniture to mildew and mold, creating an odor and health hazard. Around October 1997, the County Manager, Jeff Credle ("Credle") crawled under the courthouse to inspect the deteriorating conditions. Credle videotaped the conditions and showed the video at the October meeting of the Board. Substantial rotting of the wood structure and ponding of water in the crawlspace were evident on the video. At this meeting, Mayo agreed to seek a contractor to perform the needed repairs to the courthouse. At this time, Mayo was one of two licensed contractors in Hyde County. No entry was made of Mayo speaking with a contractor in the Board's November 1997, meeting minutes.

In April 1998, all offices and employees located in the courthouse moved out of the building. Mayo and his workers began tearing out the floors and some of the walls of the courthouse. At its May 1998, meeting, the Board adopted a resolution declaring an emergency situation and determined that immediate action was needed to correct the problems at the courthouse. Mayo, Chairman of the Board, abstained from voting on this resolution.

Several months after Mayo began work on the courthouse, the Board adopted a resolution approving $97,000.00 to be spent on the courthouse renovations. The resolution limited the cost to not exceed $97,000.00, unless the Board approved the additional expenditures prior to the work being done. The Board never sought competitive bids for the work on the courthouse. The Board entered into a written contract with Calvin C. Gibbs, Jr. ("Calvin Gibbs") (no relation to Commissioner Gibbs), through Mayo, to perform extensive renovation work on the courthouse for this amount. However, Mayo and his employees actually performed all of the renovations of the courthouse. Coble and Teeter testified that they were aware that Mayo was

doing the work and would receive payments for the work even though Hyde County's contract had been executed with Calvin Gibbs. Deese and Gibbs testified they thought Mayo would be supervising the work and Calvin Gibbs was actually performing the work. None of the commissioners, except Mayo, received any money or individual benefit from the courthouse project. The total cost of the finished courthouse project reached $179,410.42. None of the Board's minutes from their meetings show that any of this additional work and costs were approved after the Board's original authorization of $97,000.00. On 7 September 1999, the Board adopted a unanimous resolution amending the appropriation from $97,000.00 to $179,410.42. Of that sum, $167,783.28 was received by Mayo.

In the latter part of 1997, the Board also became aware of the deteriorating condition of the Hyde County Health Department building ("health department"). The wood around the windows and doors was rotted and the vinyl siding was in a dilapidated state. Moisture was also causing mold and mildew problems. The Board instructed Credle to secure informal bids to repair the health department. On 8 December 1997, B.T. Glover, a licensed general contractor, provided a bid in the amount of $37,000.00. On 8 January 1998, the Board received a bid from Calvin Gibbs in the amount of $35,900.00. On 30 July 1998, the Board, again through Mayo, entered into a contract with Calvin Gibbs to perform work on the health department. The contract provided that the cost would not exceed $35,900.00, unless the Board approved the additional work before it was done. As with the courthouse renovations, Teeter and Coble knew that Mayo would be performing the work. Deese and Gibbs testified they were not aware that Mayo would be directly involved. The cost of the finished health department totaled $110,386.42. Mayo performed all of the work and received all of this money.

The press began investigating the actions surrounding both projects. The County Auditor asked and was told by Credle that Mayo was not involved in these projects. On 25 August 2000, plaintiffs made written demand on the Board to recoup the money paid to Mayo for the work done on both projects. On 18 November 2000, the Board declined to take any action on this matter. Plaintiffs brought suit to recover the money paid to Mayo. Defendants' motions for directed verdict were denied. The jury returned a verdict against all defendants in the amount of $25,167.49 for the courthouse project and $16,557.96 for the health department project. Plaintiffs moved for a judgment notwithstanding the verdict and a new trial on the

**GIBBS v. MAYO**

[162 N.C. App. 549 (2004)]

issues of damages. The trial court denied both motions and dismissed *ex mero motu* plaintiffs' punitive damages claims. Plaintiffs and defendants appeal.

## II. Issues

Plaintiffs contend that the trial court erred in: (1) refusing to hold defendants liable as a matter of law and in not granting plaintiffs' motions on the issue of damages, (2) dismissing plaintiffs' punitive damage claim, (3) permitting defendants to mention and question witnesses concerning the costs and reasonable value of the work incurred by Mayo in performing the work on the courthouse and health department, (4) refusing to allow evidence concerning attorney's fees paid by Hyde County for the defense of this action, and (5) refusing to admit the testimony of Credle from an earlier hearing.

Defendants contend in their cross-appeals that the trial court erred in: (1) denying their motions for directed verdict, (2) prohibiting evidence concerning the costs and reasonable value of the work done on the courthouse and health department and refusing to instruct the jury that they should consider the costs and reasonable value of the work done on the courthouse and health department, and (3) allowing Credle to repeatedly assert and plead his Fifth Amendment right against self-incrimination in the presence of the jury.

## III. Judgment Notwithstanding the Verdict on the Issue of Damages

[1] Plaintiffs contend that the trial court erred in not granting their motion for judgment notwithstanding the verdict ("JNOV") on the issue of damages.

This Court applies an abuse of discretion standard of review for a trial court's denial of a motion for JNOV. *Railway Co. v. Fibres, Inc.*, 41 N.C. App. 694, 702, 255 S.E.2d 749, 754 (1979).

At the time relevant to this action, North Carolina's conflict of interest law provided in part:

(a) If any person appointed or elected a commissioner or director to discharge any trust wherein the State or any county, city or town may be in any manner interested shall become an undertaker, or make any contract for his own benefit, under such authority, or be in any manner concerned or interested in making

such contract, or in the profits thereof, either privately or openly, singly or jointly with another, he shall be guilty of a misdemeanor.

N.C. Gen. Stat. § 14-234(a) (2001). Our Supreme Court in *Insulation Co. v. Davidson County*, interpreted the meaning of this statute and stated that,

> [t]he General Assembly . . . in adopting this Act . . . made the condemnation of the transactions embraced within the terms thereof a part of the public policy of the State so as to remove from public officials the temptation to take advantage of their official positions to "feather their own nests" by letting to themselves or to firms or corporations in which they are interested contracts for services, materials, supplies, or the like.

243 N.C. 252, 254, 90 S.E.2d 496, 497-98 (1955).

> Not only will [the Court] declare void and unenforceable any contract between a public official, or a board of which he is a member, and himself . . . but it will also deny recovery on a *quantum meruit* basis. In entering into such contract a public official acts at his own peril and must suffer the loss incident upon his breach of his public duty. He may look in vain to the courts to aid him in his efforts to recoup his losses, due to the invalidity of the contract, on the grounds the public agency which he serves has been enriched by his misconduct.

*Id.* at 255, 90 S.E.2d at 498. The Court explained that "[t]his law was enacted to enforce a well-recognized and salutary principle, both of the moral law and of public policy, that he who is entrusted with the business of others can not be allowed to make such business an object of pecuniary profit to himself." *Id.* at 254, 90 S.E.2d at 498 (quoting *State v. Williams*, 153 N.C. 595, 599, 68 S.E. 900, 902 (1910)).

> The application of the rule may in some instances appear to bear hard upon individuals who have committed no moral wrong; but it is essential to the keeping of all parties filling a fiduciary character to their duty, to preserve the rule in its integrity, and to apply it to every case which justly falls within its principle.

*Williams*, 153 N.C. at 599, 68 S.E. at 902 (quoting Dillon's Municipal Corporations, Vol. 1, 4 Ed., sec. 444).

"No man ought to be heard in any court of justice who seeks to reap the benefits of a transaction which is founded on or arises out of

criminal misconduct and which is in direct contravention of the public policy of the State." *Insurance Co.*, 243 N.C. at 255, 90 S.E.2d at 498. "[T]he doors of the courts are closed to any individual, or firm in which he is financially interested, who engages in a transaction which comes within the language of the statute." *Id.*

Here, the jury returned verdicts finding that Mayo violated the conflict of interest law of North Carolina with regards to both projects. The jury also found that the other commissioners unlawfully and knowingly permitted Mayo to evade the conflict of interest law. The jury further found that Mayo had received $25,167.49 for the courthouse project and $16,507.96 for the health department project. Mayo actually received $167,783.28 in connection with the courthouse renovation and $110,386.42 for his work on the health department project.

It is undisputed that Mayo was the Chairman of the Board when he entered into a contract with Hyde County, through Calvin Gibbs, to renovate the courthouse and the health department. Although the contract was ostensibly made with Calvin Gibbs, Mayo and his employees did all of the work on both projects and were paid virtually all of the money for each of the projects. It is also undisputed that the other commissioners knew about Mayo's actions in different degrees. None of these other commissioners, however, entered into any contract with Hyde County nor received any individual benefit or financial gain from these contracts. None of the four other commissioners were interested in or received any private benefit from the contract entered into by Mayo apart from that which all Hyde County citizens received. As Mayo was an elected county commissioner when he entered into these contracts, his actions fell within the purview of North Carolina's conflict of interest law.

Our Supreme Court has stated, "[i]n entering into such contract a public official acts at his own peril and must suffer the loss incident upon his breach of his public duty." *Id.* We hold Mayo "must suffer the loss incident upon his breach" and is required to return to Hyde County the full amount of monies he received from both contracts as he was an elected commissioner and entered into these contracts for his own benefit in direct violation of the conflict of interest law of North Carolina. *Id.* The trial court erred in failing to grant plaintiffs' motion for JNOV on the issue of damages towards Mayo individually.

**[2]** The trial court properly denied plaintiffs' motion for JNOV on the issues of damages against the remaining commissioners. The conflict of interest law states that for a commissioner to be liable for violating this law he must enter into a contract for his "own benefit . . . or be in any manner concerned or interested in making such contract, or in the profits thereof . . . ." N.C. Gen. Stat. § 14-234(a). There is no evidence in the record that shows the remaining commissioners entered into any contract for their own benefit or that they were privately interested in this contract or the profits therefrom. None of the remaining commissioners received any individual benefit from this contract nor did they receive any financial gain. These commissioners merely knew, some more than others, that Mayo was doing the work on these projects. Knowledge alone is not enough to trigger liability under the conflict of interest law.

The trial court properly denied plaintiffs' motion regarding the remaining four commissioners and erred in not granting the remaining commissioners' motions for directed verdict.

### IV. Punitive Damages

**[3]** Plaintiffs contend that the trial court erred in dismissing their punitive damage claim *ex mero motu*. We disagree.

In proving liability for punitive damages, a plaintiff must prove by clear and convincing evidence the existence of one or more of the aggravating factors such as fraud, malice, or willful or wanton conduct. N.C. Gen. Stat. § 1D-15 (2003). Where the issue of punitive damages is bifurcated, as it was here, "evidence relating *solely* to punitive damages shall not be admissible" in the compensatory damages portion of the trial. N.C. Gen. Stat. § 1D-30 (2003) (emphasis supplied). Nothing in this statute prevents a plaintiff from presenting all of their evidence of liability for punitive damages. *Id.*

Here, plaintiffs' evidence to prove punitive damages was not solely related to their punitive damages claim. The record shows that the evidence plaintiffs relied upon to prove the compensatory damages claim was identical to the evidence they would have relied on to prove their punitive damages claim. Plaintiffs introduced the totality of their evidence during the compensatory damages portion of the trial to establish liability. The only new evidence plaintiffs may have presented in the punitive damages stage was the amount of punitive damages they sought.

After hearing all of plaintiffs' evidence, the trial court ruled that plaintiffs could not prevail on the issue of punitive damages based on this evidence and dismissed the punitive damages claim *ex mero motu*. The trial court's dismissal of the punitive damages claim was appropriate, particularly in light of our earlier holding requiring Mayo to disgorge the entire amount of monies he received from both projects. Plaintiffs' assignment of error is overruled.

## V. Evidence Regarding Costs and Reasonable Value of Work Done

[4] Plaintiffs contend that the trial court erred in permitting defendants to question witnesses concerning the costs incurred by Mayo in performing the work on the courthouse and health department projects.

At trial, defendants repeatedly attempted to elicit testimony regarding payments Mayo made to other people for the work done on the courthouse and health department projects. The trial court sustained certain objections by plaintiffs, but on numerous occasions allowed this evidence to be considered by the jury. Mayo was paid $167,783.28 in connection with the courthouse renovation and $110,386.42 for his work on the health department project. The jury's verdict found that Mayo kept fifteen percent of the total costs, or $25,167.49, for the courthouse project and $16,557.96 for the health department project.

As previously stated, our Supreme Court has held that it will declare void and unenforceable any contract of this type, deny recovery on a *quantum meruit* basis, and the public official must suffer any loss due to his breach of public duty. *Insulation Co.*, 243 N.C. at 255, 90 S.E.2d at 498. "[T]his Court will not recognize or permit any recovery bottomed on the criminal conduct of a public official." *Id.*

The jury found that Mayo violated North Carolina's conflict of interest law by entering into these contracts as an elected commissioner. Mayo "may look in vain to the courts to aid him in his efforts to recoup his losses." *Id.* As we earlier held Mayo to be liable for the full amount of monies received for the projects, the trial court erred in allowing evidence concerning the reasonable value of the work Mayo performed on the courthouse and health department to be presented to the jury. *Id.*

Defendants also assign as error the trial court's refusal to allow other evidence of the reasonable value of work done and

costs incurred by Mayo. We previously held that the trial court erred in allowing defendants to present evidence pertaining to the costs and reasonable value of work done on the courthouse and health department projects by Mayo. Defendants' assignment of error is overruled.

### VI. Attorney's Fees

[5] Plaintiffs contend that the trial court erred in refusing to allow evidence of attorney's fees expended by Hyde County for the defense of defendants. We agree.

N.C. Gen. Stat. § 160A-167(a) (2003) permits a county to provide for

> the defense of any civil or criminal action or proceeding brought against [a commissioner] either in his official or in his individual capacity, or both, on account of any act done or omission made, or any act allegedly done or omission allegedly made, in the scope and course of his employment or duty as an employee or officer of the . . . county . . . .

The General Assembly has specifically provided that "[t]he board of commissioners shall supervise the maintenance, repair and use of all county property." N.C. Gen. Stat. § 153A-169 (2003). Commissioners also have the responsibility for determining what is a "necessary expense" for the county. *Wilson v. Holding*, 170 N.C. 352, 356, 86 S.E. 1043, 1045 (1915). "The building of a courthouse is a necessary county expense, and the board has full power, in their sound discretion, to repair the old one or to erect a new one, and in order to do so they may contract such debt as is necessary for the purpose." *Jackson v. Commissioners*, 171 N.C. 379, 382, 88 S.E. 521, 523 (1916).

Here, the remaining commissioners' actions, alone of expending public funds for the renovation of the courthouse and health department, were consistent with the course and scope of their office. *Id.* The remaining commissioners sought advice from the Hyde County Attorney concerning their actions, voted consistently with the needs of Hyde County's facilities, and realized no personal benefit from the contracts. However, their actions combined with their judgment and knowledge of Mayo's actions raise questions whether their conduct was within the course and scope of their office, even though these actions and knowledge do not rise to the level of violating the conflict of interest law. The trial court should have allowed plaintiffs to

present evidence of the attorney's fees spent by Hyde County in defending the charges against all the commissioners.

Mayo's actions were unquestionably outside the scope of his office. Mayo was not entitled to have Hyde County provide for his defense under N.C. Gen. Stat. § 160A-167(a). Mayo's actions far exceeded merely voting that the courthouse and health department were in need of repair. The record shows he abstained from voting on the initial courthouse funding. Mayo, while Chairman of the Board, performed all of the work called for by these contracts and received virtually all of the benefits of these contracts. Mayo's actions clearly exceeded what was allowed or required by his duties as commissioner and arose outside the course and scope of his office.

The trial court should have allowed plaintiffs to present evidence of the attorney's fees spent by Hyde County in defending the charges against all of the commissioners. Mayo's actions were clearly outside the purview of N.C. Gen. Stat. § 160A-167. The remaining commissioners' actions, combined with their knowledge of Mayo's actions, raise questions as to whether they were within the scope of their office. The trial court's decision to allow or deny recovery of attorney's fees after hearing the plaintiffs' evidence lies in its discretion. *See* N.C. Gen. Stat. § 6-21.1 (2003); *see also Callicutt v. Hawkins*, 11 N.C. App. 546, 181 S.E.2d 725 (1971).

## VII. Testimony of Credle

[6] Plaintiffs contend that the trial court erred in refusing to admit the testimony of Credle, former County Manager of Hyde County, made at an earlier hearing in a different case and statements made to an SBI agent, after Credle asserted his Fifth Amendment privilege of self-incrimination.

Admission of evidence is "addressed to the sound discretion of the trial court and may be disturbed on appeal only where an abuse of such discretion is clearly shown." *Sloan v. Miller Building Corp.*, 128 N.C. App. 37, 45, 493 S.E.2d 460, 465 (1997). Under an abuse of discretion standard, we defer to the trial court's discretion and will reverse its decision "only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985).

Here, the trial court refused to allow plaintiffs to present prior testimony of Credle from an earlier case. Plaintiffs contend that the evidence was admissible under Rule 804(a)(1) and Rule 804(b)(1) of

the North Carolina Rules of Evidence. Rule 804(a)(1) permits the admission of certain statements by a declarant who is unavailable, while Rule 804(b)(1) provides that testimony given at another hearing or at a deposition is admissible if the party against whom it is offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. N.C. Gen. Stat. § 8C-1, Rule 804(a)(1) and Rule 804(b)(1) (2003).

In *Pleasant Valley Promenade v. Lechmere, Inc.*, the plaintiff filed a complaint against the defendants seeking injunctive relief only. 120 N.C. App. 650, 655-56, 464 S.E.2d 47, 52-53 (1995). Depositions of two witnesses were conducted as part of discovery. *Id.* Subsequently, the plaintiff amended his complaint to seek the recovery of damages against defendant. *Id.* at 659, 464 S.E.2d at 53. At trial, the plaintiff sought to introduce the two depositions, previously taken, under Rule 804(b)(1) due to the witnesses unavailability. *Id.* at 659, 464 S.E.2d at 55. This Court held that the depositions were inadmissible under Rule 804(b)(1) because defendants did not have a similar motive to rebut a "non-existent damages claim." *Id.*

Here, Credle was unavailable under Rule 804(a)(1) as he invoked his right against self-incrimination under the Fifth Amendment. Credle's statements, however, do not fall within the exceptions under Rule 804(b)(1). The issues from the previous case from which plaintiffs wanted to introduce testimony were far different from the issues here.

In the previous case, plaintiffs did not seek to recover monetary damages, but rather sought copies of the minutes of closed sessions of the Board's meetings. Defendants had no personal stake in the previous case. In the present case, plaintiffs sought to recover from defendants substantial monetary damages and each commissioner faced personal liability. Plaintiffs' arguments are overruled.

Plaintiffs also contend that Credle's statements should be admitted under Rule 804(b)(3) as statements against interest. This exception allows for the introduction of

[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.

N.C. Gen. Stat. § 8C-1, Rule 804 (b)(3) (2003).

Credle's statements during his deposition and testimony do not meet this exception, as Credle avoided any and all incriminating statements against himself by repeatedly asserting his Fifth Amendment privilege against self-incrimination. The statements were not so contrary to Credle's "pecuniary or proprietary interest" that he would not have made them unless they were true. *Id.*

Further, the statements made by Credle to SBI agent D.G. Whitford do not fall within this exception since they are not sufficiently incriminating to Credle. The statements mainly reflect Credle's belief that the commissioners were aware of and consented to Mayo's actions in entering into the contracts to perform work on the courthouse and the health department. These statements do not meet the requirements of Rule 804(b)(3) as they are not "so far contrary" to Credle's interests that he would not have made them unless they were true to make them reliable and admissible under this hearsay exception. *Id.*

Plaintiffs also contend that these statements should be allowed under Rule 804(b)(5), the "catch-all" exception. This Rule excepts from the hearsay rule

[a] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

N.C. Gen. Stat. § 8C-1, Rule 804(b)(5) (2003).

[I]n weighing the "circumstantial guarantees of trustworthiness" of a hearsay statement for purposes of Rule 803(24), the trial judge must consider among other factors (1) assurances of the declarant's personal knowledge of the underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, and (4) the practical availability of the declarant at trial for meaningful cross examination.

*State v. Triplett*, 316 N.C. 1, 10-11, 340 S.E.2d 736, 742 (1986).

Here, Credle's motivation for making these statements was to exculpate himself from any wrongdoing by attempting to put blame on the Board. Credle had strong personal incentives to inculpate the defendants and to exculpate his own culpability. Credle's statements do not meet the "circumstantial guarantees of trustworthiness" because he was strongly motivated to protect his own interests.

Plaintiffs have failed to show that the trial court abused its discretion in refusing to allow them to introduce Credle's prior statements. Plaintiffs' assignment of error is overruled.

**[7]** Defendants also contend that the trial court erred in permitting Credle to repeatedly plead his Fifth Amendment privilege against self-incrimination.

This Court held, in *State v. Stanfield*,

[T]here are two difficulties that may arise when a witness is presented and then refuses to testify by asserting his Fifth Amendment privilege. The first is that it permits the party calling the witness to build or support his case out of improper speculation or inferences that the jury may draw from the witness' exercise of the privilege, which cannot be adequately corrected by trial court instruction. The second concern is that it encroaches upon the constitutional right to confrontation because the presentation of the exercise of the privilege cannot be tested for relevance or value through cross-examination. As a result of these difficulties, the trial judge must weigh a number of factors in striking a balance between the competing interests. Such a balancing will be left to the discretion of the trial court in determining whether the probative value of the proffered evidence is substantially outweighed by the danger of unfair prejudice in accordance with Rule 403 of the Rules of Evidence.

134 N.C. App. 685, 692-93, 518 S.E.2d 541, 546 (1999) (quoting *State v. Pickens*, 346 N.C. 628, 639, 488 S.E.2d 162, 167-68 (1997)). Allowing a witness to repeatedly plead his Fifth Amendment right in the presence of the jury "is a practice so imbued with the 'potential for unfair prejudice' that a trial judge should closely scrutinize any such request." *Pickens*, 346 N.C. at 639, 488 S.E.2d at 168 (quoting *U.S. v. Vandetti*, 623 F.2d 1144, 1147 (6th Cir. 1980)).

Here, the trial court allowed plaintiffs to call Credle as a witness and overruled defendants' numerous objections to Credle being allowed to repeatedly assert his Fifth Amendment privilege. Plaintiffs

presented no strong reason or support for why Credle should be allowed to be called as a witness when it was known he would assert his Fifth Amendment privilege. The probative value of Credle's "testimony" did not substantially outweigh the prejudicial effect of allowing the jury to improperly speculate and draw inappropriate conclusions from it.

Defendants, however, fail to show that they suffered any prejudice as a result of this error. "It is well-established that the burden is on the appellant not only to show error but also to show that he suffered prejudice as a result of the error." *State v. Milby*, 302 N.C. 137, 142, 273 S.E.2d 716, 720 (1981). "The test for prejudicial error is whether there is a reasonable possibility that the evidence complained of contributed to the conviction . . . ." *Id.* Based on other substantial evidence showing that Mayo entered into these contracts illegally, that he received virtually all the benefits of these contracts, and that the other commissioners were aware of these actions, the trial court's error was not prejudicial to defendants' case. Defendants' assignment of error is overruled.

## VIII. Defendants' Motions for Directed Verdict

[8] Defendants cross-appeal and assign as error the trial court's failure to grant their motions for directed verdict.

Plaintiffs brought a cause of action against the commissioners under N.C. Gen. Stat. § 128-10 and also asserted common law claims. Defendants contend that plaintiffs had no cognizable claim under either N.C. Gen. Stat. § 128-10 or at common law.

N.C. Gen. Stat. § 128-10 (2003) states:

When an official of a county, city or town is liable upon his bond for unlawfully and wrongfully retaining by virtue of his office a fund, or a part thereof . . . any citizen and taxpayer may . . . recover from the delinquent official the fund so retained. Any county commissioners . . . who fraudulently, wrongfully and unlawfully permit an official so to retain funds shall be personally liable therefor . . . .

Further, this Court has stated,

[w]ithout an official who is "liable on his bond," as well as commissioners who refuse to take action against that official, no action arises under this section. The statute specifically identifies the narrow circumstances and persons that could be

held liable for retaining funds by virtue of their office, and only allows for liability on the part of commissioners when and if they fail to recover the wrongfully held funds from the bonded officer.

*Bardolph v. Arnold*, 112 N.C. App. 190, 195, 435 S.E.2d 109, 113 (1993).

Plaintiffs assert that the coverage issued by the North Carolina Counties Liability and Property Insurance Pool Fund ("the Fund") constitutes a bond contract and makes defendants liable under N.C. Gen. Stat. § 128-10. In North Carolina, "insurance and suretyship are not synonymous terms," but rather "involve different functions, relationships, rights and obligations." *Henry Angelo & Sons, Inc. v. Prop. Development Corp.*, 63 N.C. App. 569, 574, 306 S.E.2d 162, 165-66 (1983). "Insurance is '[a] contract whereby, for a stipulated consideration, one party undertakes to compensate the other for loss on a specified subject by specified perils.' " *Id.* at 574, 306 S.E.2d at 166 (quoting Black's Law Dictionary 943 (rev. 4th ed. 1968)). In contrast, "[a] surety is one 'who engages to be answerable for the debt, default or miscarriage of another.' " *Id.* (quoting Pingrey, Treatise on the Law of Suretyship and Guaranty (2) (1901)). A contract of suretyship requires three parties, the principal, the surety, and the promisee, while the insurance contract requires only two parties, the indemnitor and the indemnitee. *Casualty Co. v. Waller*, 233 N.C. 536, 538, 64 S.E.2d 826, 828 (1951).

Here, the insurance policy covering defendants bears no similarity to the surety bond. First, the insurance contract is between two parties: the Fund and Hyde County. Second, there is no specific agreement involving named employees as is stated in a public official's bond. Third, in the event that a covered loss occurs, the Fund is required to pay the loss and is not entitled to seek recovery from Hyde County or its employees.

The language of N.C. Gen. Stat. § 128-10 requires that for a person to be liable under this statute he must be an "official liable on his bond." N.C. Gen. Stat. § 128-10 (2003). This statute was not intended to include the type of insurance contract at bar. Defendants do not meet the requirements set forth in N.C. Gen. Stat. § 128-10. Plaintiffs have no cause of action under this statute. The trial court erred in not granting defendants' motion for directed verdict regarding plaintiffs' cause of action under N.C. Gen. Stat. § 128-10.

Plaintiffs also asserted a common law cause of action. Under *Bardolph*, this Court stated "if there is a common law claim . . . elected officials could potentially risk their personal assets every time they voted on a controversial issue or exercised their political judgment in the expenditure of public funds." 112 N.C. App. at 193, 435 S.E.2d at 112. We went on to hold that "actions [to recover wrongfully spent public funds] against municipal officers are statutory, the statute providing the basis for the action as well as procedural requirements." *Id.* (quoting *Flaherty v. Hunt*, 82 N.C. App. 112, 115, 345 S.E.2d 426, 428, *disc. rev. denied*, 318 N.C. 505, 349 S.E.2d 859 (1986)).

As plaintiffs have no statutory or common law claim against the commissioners and in light of our earlier holding that the remaining commissioners, with the exception of Mayo, did not violate North Carolina's conflict of interest law, the trial court erred in not granting their motions for a directed verdict on this issue as well. The trial court properly denied Mayo's motion for a directed verdict as his actions directly violated North Carolina's conflict of interest law causing the contracts to become void and unenforceable. *Bardolph*, 112 N.C. App. at 194, 435 S.E.2d at 112-13; *see Insulation Co.*, 243 N.C. at 255, 90 S.E.2d at 498; *see also* N.C. Gen. Stat. § 14-234 (2001).

## IX. Conclusion

The trial court erred in not granting plaintiffs' motion for JNOV on the issues of damages as to Mayo only and in allowing evidence pertaining to the reasonable value of work done and costs incurred by Mayo. The trial court erred in not allowing plaintiffs to present evidence of attorney's fees paid by Hyde County in defending the charges against all defendants. Plaintiffs failed to show that the trial court erred in dismissing their punitive damages claims *ex mero motu*.

Although the better practice is to not allow a witness to repeatedly assert his Fifth Amendment privilege over objection, defendants failed to show any prejudice in the trial court's error in allowing Credle to repeatedly assert this privilege in the presence of the jury. Plaintiffs also failed to show that the trial court abused its discretion in refusing to allow into evidence statements made by Credle.

The trial court erred in failing to grant defendants' motion for directed verdict regarding plaintiffs' cause of action under N.C. Gen. Stat. § 128-10. The trial court also erred in failing to grant the remain-

STATE EX REL. UTILS. COMM'N v. BUCK ISLAND, INC.

[162 N.C. App. 568 (2004)]

ing commissioners' motion for a directed verdict regarding plaintiffs' common law cause of action. The trial court correctly denied Mayo's directed verdict motion as his actions directly violated the conflict of interest law causing the contracts entered into to become void. *Insulation Co.*, 243 N.C. at 255, 90 S.E.2d at 498.

We remand this case to the trial court with instructions to: (1) conduct a hearing and ·allow evidence pertaining to the amount of attorney's fees expended by Hyde County in defending all the commissioners, (2) grant plaintiffs' motion for a JNOV on the issue of damages against Mayo only and enter judgment against him for the full amounts Hyde County that he received on both contracts, (3) grant all defendants' motions for directed verdict as to plaintiffs' cause of action under N.C. Gen. Stat. § 128-10, and (4) grant the remaining four commissioners' motions for directed verdict on plaintiffs' common law claim.

Affirmed in part, reversed in part, and remanded with instructions.

Judges HUDSON and STEELMAN concur.